1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   ALVARO LEAL SALDANA, JR.,              No.  1:15-cv-00827-DAD-JLT (HC)

12              Petitioner,                 **FINDINGS AND RECOMMENDATION**
                                            **TO DENY PETITION FOR WRIT OF**
13        v.                                **HABEAS CORPUS**

14   S. PEERY, Warden,                      **[TWENTY-ONE DAY OBJECTION**
                                            **DEADLINE]**
15              Respondent.

16

17        Petitioner is currently in the custody of the California Department of Corrections and

18   Rehabilitation serving a sentence of eighty years-to-life for his conviction of first degree murder

19   with enhancements for use of a firearm, for assisting a gang, and for having suffered a prior

20   conviction.  In this action, Petitioner raises a multitude of claims challenging his conviction.  The

21   Court finds that the state court rejection of these claims was not contrary to, or an unreasonable

22   application of, Supreme Court precedent and recommends the petition be **DENIED.**

23   **I.        PROCEDURAL HISTORY**

24        On May 31, 2011, Petitioner was convicted in the Stanislaus County Superior Court of

25   first degree murder (Cal. Penal Code § 187(a)), with the use of a firearm (Cal. Penal Code §

26   12022.53(d), (e)(1)), for the benefit of or in association with a criminal street gang (Cal. Penal

27   Code §186.22(b)(1)).  (Doc. No. 23, Ex. 1.)  In a bifurcated court trial, Petitioner was found guilty

28   of having suffered a prior serious felony conviction which constituted a strike.  (Id.) Petitioner

                                            1

1    was sentenced to 80 years-to-life.  (Id.)

2            Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

3    DCA").  On August 26, 2013, the Fifth DCA issued its opinion affirming the judgment.  People v.

4    Gutierrez, No. F062970, 2013 WL 4523566 (Cal. Ct. App. Aug. 26, 2013).  Petitioner filed a

5    petition for review in the California Supreme Court.  (LD[1] 19.)  On November 20, 2013, the

6    petition for review was denied.  (LD 21.)

7            Petitioner next filed a habeas petition in the Fifth DCA.  (LD 22.)  The petition was

8    rejected on October 23, 2014.  (LD 23.)   He next filed a habeas petition in the California

9    Supreme Court.  (LD 24.)  On April 22, 2015, the petition was denied.  (LD 25.)

10           On June 1, 2015, Petitioner filed the instant petition for writ of habeas corpus in this

11   Court.  (Doc. No. 1).  Respondent filed an answer on January 20, 2016.  (Doc. No. 23).  Petitioner

12   filed a traverse to Respondent's answer on May 13, 2016.  (Doc. No. 18.)

13   **II.     FACTUAL BACKGROUND**

14           The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[2]

15   Defendants Ray Gutierrez, Jr., and Alvaro Leal Saldana, Jr., stand convicted,
     following a jury trial, of first degree murder (Pen.Code, 1 § 187, subd. (a)), during
16   the commission of which a principal personally and intentionally discharged a
     firearm and proximately caused death (§ 12022.53, subds.(d) & (e)(1)), and which
17   was committed for the benefit of or in association with a criminal street gang (§
     186.22, subd. (b)(1)).  Following a bifurcated court trial, each was found to have
18   suffered a prior serious felony conviction that was also a strike. (§ 667, subds. (a)
     & (d).) Each was sentenced to a total term of five years plus 75 years to life in
19   prison and ordered to pay restitution and various fees, fines, and penalties. Both
     appeal. We affirm the judgments.
20
21                                        **FACTS**

22                                          **I**

23                              **PROSECUTION EVIDENCE**

24   On March 22, 2008, Tommy and Eloisa Gonzales were married in Turlock. [N.2]
     Roger Villanueva, whose nickname was "Smoke da Villain," was one of the
25   groomsmen. His girlfriend, Irma Bernal, was a bridesmaid. Members of the
     wedding party wore red and white. The wedding reception was held at the Grange
26   Hall in Hilmar. More than 100 people attended. In keeping with the wedding

27   _____
     [1] "LD" refers to the documents lodged by Respondent.
     [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
28   Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
     2009).

party's color scheme, the color red predominated in their clothing. Entertainment at the reception included a group of Eloisa's friends who called themselves Spit Flame and who rapped and sang. Villanueva and Rene Zarate ("Bullet G") were among the group's members. [N.3]

[N.2] Except as otherwise specified, references to dates in the statement of facts are to the year 2008. For the sake of clarity, and because sometimes last names were not given, we refer to several persons by their first names. No disrespect is intended.

[N.3] One of the group's founders Moses Rodriguez ("Rap Addict"), had been shot and killed in the "Woods" area of Turlock about a year earlier. Eloisa was godmother to his son.

Defendants (who are brothers) did not attend the wedding, but were present at the reception. They did not get along with Zarate or Villanueva. Miguel Perez, a good friend of Eloisa and Villanueva, also attended the reception. Perez's status with the Norteño gang was "inactive." He had "just kind of walked away from it" 10 to 15 years earlier, creating friction between him and gang members. He had had prior verbal confrontations with Gutierrez because of it. He had not had any confrontations with Saldana. Perez also had personal issues with Gutierrez that went back a number of years and were not gang related.

At some point, defendants were yelling at Chico, Perez's friend, on the front lawn of the Grange Hall. Perez went to get Chico to take him across the street to a bar. Perez also tried to put his hand out and tell them to "squash" all the problems, but Gutierrez looked at him and laughed. Perez and Gutierrez then exchanged blows. Gutierrez fell back after Perez struck him. Meanwhile, Saldana was standing behind Perez, and there were several people hitting Perez from behind. Someone— Perez thought Villanueva, although he did not see who threw the punch—knocked Saldana out. Tommy was yelling at Gutierrez and Perez, and Perez told Gutierrez they would see each other when they saw each other. [N.4]

[N.4] Near the end of the reception, there was a fight involving Tommy, some of his groomsmen, and about 50 people in the bar's parking lot. Defendants had already left by the time this fight broke out.

About four days after the wedding, Villanueva and Bernal moved to Arizona. Sometime during that four days, they were driving near the Turlock Cemetery when they saw Saldana, who was alone, driving the opposite direction. He stopped the car, pointed at Villanueva, and made a gun gesture with his hands. Villanueva told Bernal "they" were looking for him, although he did not say who.

Jorge Tapia was defendants' second cousin. He grew up in the Angelus Street area of Turlock and, as of May 25, resided in the area of Angelus and Ninth Street. He knew of the Norteño gang, which claimed red and whose members sometimes had tattoos such as "XIV" and "X4." Tapia sometimes socialized with persons who "claim[ed] Norteño," but he denied being a gang member himself.

About a week before May 25, Gutierrez gave Tapia an item wrapped in cloth and asked him to hold it for him. Gutierrez did not say anything about a gun or tell Tapia what the item was. Although it felt heavy and hard, Tapia did not unwrap it to see what it was, but put it in a shoebox in his room and left it there. [N.5]

[N.5] Detective Bertram and Investigator Bunch of the district attorney's office interviewed Tapia some two to three weeks after May 25. During the

interview, Tapia made it clear he knew Gutierrez had given him a gun. Tapia said it was a .40–caliber Glock with a red laser sight.

Around the same time, Villanueva and Bernal returned to Villanueva's mother's house in Keyes. They planned to return to Arizona the week following May 25.

On May 25, Gutierrez telephoned Tapia and asked him for "that thing." An hour or so later, Gutierrez came by Tapia's residence in his white Nissan Altima. Saldana was with him. Both were wearing blue pants and black shirts. Tapia met them at the car and gave Gutierrez the wrapped item, then got into the back seat. Gutierrez said they were going to go check out some shoes "from Tommy." [N.6] Villanueva's name was not brought up, and nobody said anything about what had happened at the wedding reception. Before the car pulled away, however, Saldana said maybe somebody would get in a fight.

[N.6] Tommy sold knockoff Michael Jordan tennis shoes.

Around 6:00 p.m. on May 25, Eloisa attended a barbecue at her friend Brandy's residence, a duplex in the 200 block of Angelus Street. The barbecue was being held because it was Moses Rodriguez's birthday. About 20 people had met up at the cemetery where he was buried, then gone to the house on Angelus. Villanueva was one of those at the cemetery.

Eloisa went to the grocery store, then returned to the duplex. By the time she got back, more people—including defendants—had arrived. They and at least seven people were standing against the fence of an abandoned house next to the duplexes. Defendants both were wearing black T-shirts. Gutierrez had on a hat. A chunky, Hispanic male appeared to be in their company.

Villanueva and Darnell Lambert drove up and parked across the street, then walked up to the group of men. Villanueva told Saldana that he wanted to "squash it" (let it go) and did not want any problems with "them," but, when Villanueva extended his hand, Saldana refused to shake it. Eloisa saw the look on Saldana's face; it was angry and he was grinding his teeth. He stayed like that until he turned away. Villanueva—who was considerably larger than Saldana—followed him to the backyard of the abandoned house. None of the other men went with them. As Villanueva went toward the back, he took off his Oakland A's hat and jacket (underneath which he was wearing a white T-shirt) and hung them on the fence. He also removed a thick chain with a cross that he wore all the time. Eloisa did not see where he put it.

Concerned, Eloisa yelled at Lambert to do something, and not to let them go to the back. Lambert responded that it was going to be fine, as they were just going to talk out whatever it was. Eloisa then yelled for Tommy. Tommy was at his father's house, which was on the other side of the abandoned house. [N.7] He came out onto the front porch and told Lambert to go back there.

[N.7] The abandoned house was between Brandy's duplex and Tommy's father's house.

Meanwhile, Gutierrez was pacing quickly back and forth by the fence. Saldana and Villanueva moved out of Eloisa's sight. While Lambert was responding to Tommy, Gutierrez ran to the back. Eloisa lost sight of him, then, within seconds, she heard multiple gunshots fired in rapid succession from a single gun. As soon as the shots stopped, she saw defendants run down Angelus Street. She ran toward the back

4

and found Villanueva bleeding to death on the ground.

Eloisa did not think the shooting was gang related. She did not see anyone flash gang signs or any indication of gang activity. She was aware that the color red was associated with Norteños. She was also aware defendants were members of Varrio West Side Turlock or Turlocos, a Norteño gang that claimed the color red and number 14. Eloisa denied Tommy was a Norteño; she chose red accents for her wedding colors because Tommy's birthstone is red garnet.

At approximately 6:10 p.m. on May 25, Turlock police received a report of the shooting. Sergeant Morgan and Officer Ramon were the first to respond, arriving at the scene within a minute or two of being dispatched. At least 50 to 70 hostile people were in the street, yelling and pointing toward the back of an apartment complex. In the back were a few people and Villanueva, who appeared to be dead.

Eloisa was angry and yelling that it was not right. Morgan made contact with her, but Tommy tried to hush her and told her that she did not see anything. Morgan tried to talk to Tommy, but Tommy said he did not see anything. Tommy said he and Eloisa had been inside his father's home next door.

Morgan had had prior dealings with Tommy and considered him a gangster. From working in the area for 20 years, Morgan considered Angelus Street in this part of town to be the heart of Turlock's gang area. Morgan was also familiar with the "Woods," a part of Turlock in which many of the street names ended with "wood." He believed, but was not positive, it was Sureño territory. Morgan was familiar with the Moses Rodriguez homicide. No one was ever apprehended; it was deemed at the time possibly to be self-defense.

An autopsy revealed multiple bullet wounds, including five entrance wounds, to Villanueva's body. Some were from front to back, while others were from back to front. One bullet, which entered the right side of the head, was found inside the brain. Abrasions surrounding the bullet hole indicated it was likely a close-range shot. Another bullet entered the left side of the neck and struck the mandible. Fragments of that bullet were located in the body. Another bullet was located near the pelvic bone area. The gunshot wound to the head was fatal, while the wounds to the left side of the back and left side of the hip could also have been fatal. It was not possible to determine in which order the wounds were received, or the position Villanueva was in at the time he received them. Similarly, the gun's position when any given shot was fired could not be determined. The cause of death was multiple gunshot wounds. Toxicology reports revealed small amounts of alcohol, cocaine, MDMA (Ecstasy), and methamphetamine in Villanueva's system. Cocaine and methamphetamine are stimulants that can cause some users to become aggressive.

Thirteen spent .40–caliber shell casings were found at the scene, as were five expended bullets. [N.8] Subsequent examination showed the shell casings were all fired from the same firearm, most likely a Glock pistol. Subsequent analysis of the fired projectiles showed they were .40 caliber, and the rifling was consistent with the standard rifling of a .40–caliber Glock pistol.

> [N.8] One of the bullets was lying on the ground, while the others were recovered from walls of buildings and other nearby objects.

On the night of May 29, the white Nissan involved in the shooting was found in San Jose, partially burned and smelling of a gasolinelike accelerant. A singed black beanie cap was found about 25 feet from the vehicle. Subsequent testing

showed Gutierrez to be the major contributor to DNA found on the hat. When Gutierrez was brought to the Turlock Police Department following his arrest, he complained that his arm was hurting and said he burned it when he was barbecuing. At the hospital, however, he told the doctor the burn was from gasoline. His face also appeared to have been burned.

Tapia assisted the police in locating defendants in North Highlands. Gutierrez's identification, and the Nissan's registration and key were found at the same location.

On August 15, there was a fight between Manuel Nunez and Steven Ramirez, two inmates housed in the SHU at the Stanislaus County Public Safety Center (jail). [N.9] As a result, their cell was searched. Two large rolls of wilas were found. [N.10] The wilas were turned over to Paul Teso, a gang expert in the Classification Unit. Teso had worked as a gang officer for more than 11 years. His expertise came from interviewing hundreds of suspected and admitted gang members, as well as classes he took on gangs in general and Stanislaus County gangs in particular.

> [N.9] The SHU is the jail's maximum security housing unit. Many Norteños are housed there.

> [N.10] A wila is microwriting—a small written note—used by prisoners (usually gang members) to communicate with each other, and with those in other custodial facilities and out on the streets, without jail personnel being privy to the communication.

Teso explained that if an inmate coming into custody claims gang membership, he is housed with the gang with which he claims affiliation. For inmate protection and security, Norteño gang members are segregated from the general population and from members of other criminal street gangs.

There is a Norteño chain of command at the jail. The lowest level is yard security. This inmate is in charge of security out in the yard, and makes sure Norteño inmates "program" on the yard the same way they would in prison. Next is the teacher, who is in charge of education. Norteño gang members have mandatory training an hour a day. The training covers a variety of topics, including writing wilas. The next level is the group leader. He is in charge of a particular cell in which a group of Norteño inmates are housed. Next is tier security. He is in charge of a group of cells on a tier. Next is the channel, who usually has communication to the streets. The highest person at the county level is the overall, who is in charge of all three county facilities.

The "14 Bonds" are rules and regulations used by the Norteños to keep everyone in line. Norteños take the 14 Bonds and household policies (which vary, depending upon the facility) "very seriously, serious [enough] to kill for." A Norteño who does not follow the rules is "subject to discipline up to death." Fear and intimidation are how Norteños keep each other in check; someone not following the rules is subject to discipline at the discretion of the person in charge. A removal occurs when an inmate is no longer welcome in the gang due to his rule violation(s), and so his face will be sliced to leave a scar. No matter where he goes within any custodial facility, a background check will be done to determine why he was removed.

Once an active Norteño gang member is booked into the jail, he will be placed "on

freeze." This means he cannot hold any position, no information is supposed to be filtered through him, he is not supposed to have access to wilas, and he cannot participate in education or exercises or program with the active Norteños. The rules of the gang require that the new arrival report his incarceration to the gang higher-ups by filling out a new arrival questionnaire, which is given to the group leader and from there moves up the chain of command. This allows the gang to do a security check by channeling the information from the questionnaire to the streets and prisons, to find out if there is any negative information about the new arrival. If the information shows anything for which the new arrival could be removed and he was not cleared, then the new arrival will be assaulted or even killed. The new arrival will be on freeze until the security check is run and he is cleared and in good standing.

A Norteño dropout is supposed to be assaulted (with weapons, if available) and even killed on sight. A dropout is considered a degenerate who is worse than a child molester. If an active member knows someone to be a dropout and has access to that person, the active member is to assault the dropout. If an inmate is labeled a degenerate, this shows he was once a Norteño gang member and has stepped away from the organization. To a Norteño, a Norteño dropout is probably the worst thing someone can be. If an active gang member associates with a dropout (something that does not happen in custody, but does occur out on the streets) and is identified by another active member as doing so, the person who was associating with the dropout will have to explain why he did so and will usually have to "put in work" to clear himself and get back in the organization's good graces. Coming to the aid of a dropout who was fighting with an active Norteño would be a very severe rule violation, because it would be considered aiding the enemy "against your homeboys."

"Red-on-red violence" refers to when a Norteño assaults another active Norteño. It is not activity that is sanctioned by the gang, as Norteños are supposed to stick together. Red-on-red crime is seen as weakening the organization. Accordingly, in order for a Norteño to remove another active Norteño, he has to have clearance from higher up the chain of command. If he removes or assaults another active Norteño without clearance, he himself will be subject to removal. In Teso's experience, if there is red-on-red violence that is not cleared beforehand or sanctioned from above, the people responsible will have to write a report and explain their actions. That information will get channeled to the prisons, and the prison shotcallers will determine if the perpetrators will remain in good standing in the gang. If it is determined the removal was a bad one, the perpetrators will be disciplined for their actions and possibly removed themselves.

Insofar as the wilas seized following the fight were concerned, Teso knew Steven Ramirez to be tier security of the east quarters of the county jail. The east quarters housed Norteños. Manuel Nunez was the overall, meaning the person in charge, or shot caller, of all three county facilities.

Two new arrival questionnaires were among the 60–plus wilas related to this case. One was written from "Tito" to "La Casa," which refers to the stronghold or household of the Norteños. It was dated June 14; defendants were both booked into the jail on June 12, and it generally takes a day for a new arrival to complete and submit a new arrival questionnaire. The wila gave information such as full name, booking number, date of birth, physical description, and tattoos, all of which corresponded to the information Teso had about Saldana. As of June 14, Saldana was an active Norteño; however, as with all new arrivals, he was placed on freeze. Teso surmised he was cleared not long after his arrival, because Teso found his

name on an active tier roster, which is a list of all active Norteño gang members in custody and where they are housed. As of March 2011, when Teso testified, Saldana was still housed with the active Norteños, which would not have been the case if officers had received information he was in bad standing and subject to removal.

The other wila, which was dated June 15, was also addressed to La Casa. It gave a name, nickname ("Ramo"), date of birth, booking number, physical description, and tattoos, all of which corresponded to the information Teso had about Gutierrez.

In the wilas, defendants both gave their town as Turlock, and their "hood" as VWST, meaning Varrio West Side Turlock. Neither wila stated what happened in the backyard with respect to Villanueva. During his career, however, Teso had reviewed thousands of wilas written by Norteños, and he had never read one in which the gang member confessed to the crime that put him in custody.

According to Teso, fear and intimidation are "hallmarks" of the Norteño criminal street gang. They keep their members in line through fear and intimidation on the streets and in the neighborhoods, plus citizens are reluctant to cooperate with law enforcement because of fear of retaliation from the gang. Fear and intimidation create a reputation for the gang, and the gang benefits because the fear and intimidation allow gang members to carry on with their criminal activity. Reputation is important for a gang, as it intimidates other gangs and allows the gang to establish control over a specific area, for example, for drug sales, while making it less likely a rival gang will attempt to infringe on that area. Fear and intimidation among the ranks of Norteños benefits the gang as a whole, because all members benefit from the gang's reputation, even in prison. If a gang is known in the prison system as being weak, it will be victimized by other gangs. If a gang has a strong reputation, it will be easier for that gang to recruit new gang members and build the gang stronger in numbers.

Investigator Froilan Mariscal of the district attorney's office also testified as a gang expert. He had been raised in Modesto and exposed to the Norteño criminal street gang from childhood. He had training and experience with respect to Hispanic gangs, primarily Norteños and Sureños.

Mariscal explained that the Norteño criminal street gang is a large organization with approximately 3,000 to 4,000 documented members in Stanislaus County as of May 2008. Depending on the neighborhood, it may break up into little subgroups or subsets of more tightly knit gang members who claim a particular neighborhood as their own and use a certain name for that neighborhood. For example, Deep South Side Modesto and OGL, South Side Modesto are both groups of Norteño gang members, and they unify under the Norteño organization, the color red, and the number 14. Because they are from different neighborhoods, however, they use different names. "Turloco"—a combination of "Turlock" and "loco," Spanish for "crazy"—is a word Norteño gang members in Turlock adopted for themselves. Varrio West Side Turlock, which goes by the acronym VWST, is the primary Norteño gang in Turlock. Angelus Street is a very active location for Norteño gang activity in Turlock.

Based on his personal involvement with hundreds of investigations of gang crimes, Mariscal opined that as of May 2008, the primary activities of the Norteño criminal street gang were murders, attempted murders, assaults, drug dealing, robberies, car thefts, burglaries, various crimes associated with weapons

violations, and various crimes associated with narcotic violations. The Norteño gang had a reputation for being violent within its own gang, and also in the eyes of rival gangs and communities as a whole.

According to Mariscal, gangs thrive through fear and intimidation. Those are hallmarks of the Norteño criminal street gang. Respect is a big issue for gang members. They want to be respected, and to them, the more someone fears them, the more they are respected. Instilling fear and intimidation in others equals respect to them.

For a known dropout physically to assault an active gang member in the presence of other gang members is "an ultimate sign of disrespect." A dropout is considered "lower than scum" and the enemy of the gang. In Mariscal's experience, the only way an active gang member can rebound from that is to respond "with ultimate violence" against the dropout. If he does not, he will be viewed as weak. He has to prove he is still worthy of being in the gang and can respond with violence when confronted with violence. Because the Norteño gang thrives off of the fear and intimidation coming from violent acts within the gang, if there are members who are not willing to participate in violent acts or to prove their violent tendencies, especially after being disrespected, the gang and its reputation fall apart. The gang will not be able to function and commit the crimes that allow a gang to thrive.

Villanueva had gang tattoos, but also had a tattoo reading "Bidnezz First." This was consistent with the contents of the Saldana wila, which stated that the author did not know if the person he was accused of murdering was active or nonactive, but that on several occasions he promoted himself as a degenerate: He was known for hanging around with inactive individuals and, when confronted about the people with whom he associated, made comments about how he was all about his money and the homies did not put money in his pocket. Nothing in his investigation led Mariscal to believe Villanueva was a Norteño dropout. Rather, investigation showed he was an active gang member at the time of the wedding and the date he was shot.

Mariscal had information Villanueva was in trouble with the gang at the time he was killed. Although he was still an active gang member at that point, the fact he came to the aid of a dropout (Perez) against active gang members two months earlier at the wedding is something that would get a person in trouble with the gang. [N.11] If Villanueva was not considered to be in good standing with the gang, it would have been very unwise for him to go to the area that has the most Norteño gang activity in Turlock. In Mariscal's opinion, Villanueva may have thought he was in good standing when he went to Angelus Street.

> [N.11] There is a difference between not being an active gang member and being a dropout. Being inactive does not necessarily mean the person is not in the gang anymore, but simply that the person stepped away or is not currently associating or conducting criminal activity with the gang. Being a dropout means the person is no longer part of the gang and has decided to disassociate completely from the gang. Although Perez testified he was not active, he previously told Mariscal he was a dropout.

In giving an opinion as to whether someone is a gang member, Mariscal considers the totality of the circumstances based on the result of an investigation he conducts of the person. He uses 12 criteria, which include whether the person has been arrested with other gang members in the past; whether the person associates with gang members; whether the person has been identified as a gang member by a

9

reliable source; whether the person has admitted being a gang member in the past; whether the person has been contacted wearing gang colors; whether the person has possessed gang paraphernalia; whether the person has admitted gang membership during a classification interview; whether the person has used gang symbols; whether the person frequents gang areas; whether the person has gang tattoos; and whether the person's name has been found on a gang roster. A person must meet at least two of the criteria before Mariscal will call that person a gang member.

In Mariscal's opinion, Gutierrez was a Norteño gang member on May 25. Mariscal based this opinion on everything he reviewed involving Gutierrez: Gutierrez was contacted, on four occasions, while associating with other Norteño gang members; on nine occasions, he was arrested alone or with other gang members; he had gang tattoos, including "Varrio West Side Turlock"; he admitted being a Northerner on three occasions; he used gang hand signs and symbols; on one occasion, he was identified as a gang member by a reliable source; and he admitted being a gang member during a classification interview at the jail. [N.12]

> [N.12] With respect to both defendants, Mariscal described in detail for the jury the reports and other information upon which he based his opinions. We discuss this testimony in more detail in conjunction with defendants' claim it was improperly admitted, post.

In Mariscal's opinion, Saldana also was a Norteño gang member on May 25. Mariscal based this opinion on everything he reviewed concerning Saldana: Saldana associated with Norteño gang members on nine occasions; he was arrested alone or with gang members on 12 occasions; he had gang tattoos, including "VWST"; he was identified as a Norteño gang member by a reliable source; he used or possessed gang symbols on three occasions; his name appeared on an active gang member roster; and he admitted being a Northerner on four occasions.

In Mariscal's experience, red-on-red violence is disfavored by Norteños. A Norteño wanting to assault a fellow gang member must first get approval from the gang. If there is red-on-red violence, the parties involved submit reports to the gang leaders. The gang leaders actually conduct an investigation into the incident to determine whether the person who committed the assault was in the right. Often, the gang members who commit these assaults are cleared, because the investigation reveals the victim of the assault violated the rules of the gang first.

Mariscal reviewed the wilas found in the cell of Nunez and Ramirez, and was able to gather gang intelligence from them that formed the basis for some of his opinions. In particular, he looked for an active tier roster, which was a list of active gang members within a certain area of the jail. One of the wilas was such a roster; Gutierrez was on the list of active gang members within the jail.

From one of the wilas that was seized, Mariscal was able to form an opinion concerning whether defendants were cleared following their arrival in the county jail. In the wila, it was reported they were under investigation, both had submitted their full accounts of what occurred, and Villanueva's cousins had submitted reports about what took place. If defendants had not been cleared of this incident, they would have been removed from the gang setting and gang housing long before trial, which was almost three years after the homicide. Instead, they had been active, and functioning as part of the gang, the entire time. This indicated the gang investigated the incident and concluded either Villanueva was justifiably killed or defendants did not kill him.

The fact defendants were cleared was "extremely important" to Mariscal's opinion as to whether the Norteño gang benefited from the crime. When two active Norteños kill another active Norteño and do not suffer penalties for it from the gang, it sends a strong message to the remainder of the gang that members will follow the gang's rules or be "dealt with up to murder." Someone considered a degenerate will not be allowed to function within the gang. The gang thrives off of fear and intimidation, within both the community and its own members. That is how the gang keeps its members functioning, committing crimes, and working for the benefit of the gang.

## II

### Defense Evidence

On May 25, Alicia Gutierrez resided in the 200 block of Angelus Street. That day, there was a big party next door. Alicia could tell there were a lot of gang members present, because they had head bandanas and wore red. [N.13]

[N.13] Alicia, who was not a gang member, did not like gangs.

Alicia saw two people arguing angrily on the sidewalk, in front of the empty building, for about five minutes. Perhaps 100 people were watching, but none intervened. Alicia could not describe the two who were arguing because they were not turned toward her, but one, who was wearing a white shirt and hat, was taller and chunkier than the other.

The two started shoving each other while the people around them just watched and egged them on. The two then went into the backyard of the vacant duplex. They went by themselves, with the bigger man walking first, but after a few minutes about 20 people went back with them. At that point, Alicia returned to her apartment. She could hear them continuing to argue, and she saw them pushing and shoving each other. They were almost to the end of the backyard, close to the alley. The people who followed them back were closer to the front of the duplex. They were watching, but making no effort to stop the altercation.

The pushing went on for a couple of minutes. Alicia could see fists going up. She did not see anybody with a weapon, although she did see one of them reach into his waistband area. She did not know which one. The fighting went on for a couple of minutes, then she heard gunshots. She heard one shot, then a half-second pause, then another shot, and "then they were on top of each other." Then there was a longer pause and a final shot. She believed she heard at least five or six shots altogether.

During the course of his investigation at the scene of the shooting, Detective Tosta found bullets and bullet holes in the south fence line of the property. They ranged from 15 to 27 inches above the ground, and from 13 feet 9 inches to 18 feet 6 inches west of the east fence line. There were also several bullets, bullet holes, and ricochet marks in the building directly south, across the alley from the fence. They ranged from four feet to nine feet three inches above the ground.

On May 28, Detective Bertram interviewed Debbie Dunuan (Villanueva's mother) and Irma Bernal. Both concluded Tommy had some complicity in Villanueva's death due to numerous telephone calls Tommy made to Villanueva, insisting he come to the barbecue. During the neighborhood canvas that was conducted after the shooting, however, several residents reported overhearing individuals present

11

at the party say defendants were the ones responsible for shooting Villanueva. Even those who suspected Tommy was involved clearly identified defendants as being "the responsibles."

Tapia's story about what happened evolved and changed during the course of his interview with Bertram and Bunch. When Bertram and Bunch went to Tapia's house, they discovered he had lied about where the gun had been stored. They did not discover anything to change Tapia's assertion Gutierrez had the firearm when he went to the location of the shooting, however.

Gunsmith Paul Mangelos testified as an expert on firearms in general and Glocks in particular. He explained that a .40–caliber Glock is a semiautomatic firearm, meaning it has a clip or magazine; and ejects a spent shell, feeds in a new cartridge, and fires a bullet each time the trigger is pulled. Changing one part on the gun makes it fully automatic; conversion kits are available on the Internet, although converting the gun to fully automatic is not legal in California. With a fully automatic firearm, one trigger pull may fire multiple rounds. A fully automatic Glock can fire approximately 1,200 rounds per minute, meaning it should fire 13 shots in less than a second. While firing, the gun will be hard to control and will be moving due to recoil. Someone hearing a fully automatic Glock being fired will not be able to determine how many rounds were fired.

Gutierrez, who was 31 years old at the time of trial, testified that he had been acquainted with Perez for about 25 years. The two had a hostile relationship, because Perez had molested Gutierrez's cousin when she was about seven years old. As a result, Gutierrez and Perez had had a number of fights, most of which were won by Perez. These had nothing to do with a gang.

Gutierrez attended Tommy's wedding reception. A lot of his family members were there, and they all were talking and having a good time.

It was kind of hot inside the Grange Hall, so at some point, defendants went outside to get some fresh air. Perez, Villanueva, and possibly more men approached. Prior to this time, Villanueva and Gutierrez had had some problems. Villanueva had "pretty much acted stupid toward[ ]" Gutierrez, although Gutierrez did not know why. Also prior to this time, Gutierrez had been in a lot of fights, mostly because of the people with whom he associated. At the time of the wedding reception, he was affiliated with a Norteño gang, as were Villanueva and Perez. Gutierrez was not angry at Perez about whether he was in or out of a gang; that had nothing to do with anything.

Perez approached Gutierrez and asked to talk to him, indicating kind of toward the back. Gutierrez was willing to go with Perez even though he did not think they were going to talk, but Saldana said no, that they could talk right there. Perez then punched Gutierrez in the face. Gutierrez stumbled back, then got up and started fighting with Perez. At some point, Gutierrez saw Saldana on the ground. Villanueva kicked Saldana in the face while Saldana was down. Saldana did not appear to be conscious.

Gutierrez and Perez continued fighting, and a large group of people surrounded them. Tommy and Eloisa then came out and broke it up. Eloisa was upset and accused Gutierrez of disrupting her wedding. Saldana had been down for two or three minutes; Gutierrez helped him up and they both left. They were already gone by the time the fight started across the street. They had been at the reception for two to three hours when they left, during which time they had had no problems

with Perez and Villanueva. Gutierrez considered this "just another fight"; he was not out for revenge afterward, despite what happened to Saldana.

Gutierrez did not see Villanueva, and was not looking for him or Perez, between the date of the wedding reception and the day of the shooting. He did not even know Villanueva was in town. As of the day of the shooting, Gutierrez was living with his mother on the north side of Turlock, across town from Angelus Street. He did not own a .40–caliber Glock, and never left a gun with Tapia. He did leave some marijuana at Tapia's house, however, because Gutierrez's mother would not allow it at her house. The marijuana was about the size of a brick, and was wrapped with plastic wrap inside cloth. Gutierrez took it to Tapia's house about a week before picking it up.

Gutierrez had been friends with Moses Rodriguez, but he did not know about or attend the celebration at the cemetery. He contacted Tapia because he had a buyer for the marijuana and wanted to pick up the package. The plan was for defendants to pick it up, then go to Ranch Burger, a restaurant off Lander, where they would meet the buyer and also get something to eat.

Tapia lived on Angelus Street, about three blocks from where the shooting took place. On the way there, defendants did not discuss Villanueva and had no plans to confront him. Defendants picked up Tapia in the white Nissan, which was registered to a relative of Gutierrez's wife, but on which Gutierrez had taken over the payments. Gutierrez was driving. Gutierrez remained in the car; he had telephoned Tapia earlier, and Tapia came out with the marijuana. Tapia did not provide Gutierrez with a gun, and Gutierrez did not show one to Tapia. Saldana did not have any gun that Gutierrez saw. There was no discussion about Villanueva.

Once Tapia got in the car, the plan was to go eat at Ranch Burger, which was about half a mile to a mile away. As they drove down Angelus, they saw 70 to 80 people in the street and in front of the houses. When Tapia saw Tommy, he told Gutierrez to stop. He said he wanted to see if Tommy had any new Jordans. Gutierrez pulled over. Tapia got out of the car and went toward the carport, where Tommy was located. Defendants also got out. Alcohol was being served, and Gutierrez accepted the offer of a beer. Defendants were not angry; Gutierrez did not see Villanueva.

Defendants stood by the opening in the fence, watching two men play dice on the sidewalk. The plan was for Tapia to look at the shoes, then he and defendants would go on and eat, and Gutierrez would get rid of the marijuana. They had been there for about five to 10 minutes when Gutierrez noticed Villanueva approaching. Villanueva was wearing a jacket; he took it halfway off, then a light-complected Hispanic male stopped him and they argued a bit. Gutierrez did not know who the man was. The man was telling Villanueva just to let it go, that it was not the time or place.

Villanueva went up to Gutierrez and said, "Let me holler at you." Villanueva did not exchange words with Saldana or offer to shake hands. Gutierrez did not believe it was going to be a friendly talk, but he said, "All right." Villanueva then walked through the gate and Gutierrez followed. Gutierrez thought there would probably be a fight. He did not hear anyone yell at Darnell Lambert.

About 25 or 30 people followed them into the backyard. Villanueva handed his hat and jacket to someone. He then turned around and rushed Gutierrez. Villanueva

swung at Gutierrez, so they started to fight. There were no words exchanged, either out front or in the backyard. Gutierrez did not know where Saldana was at that point. No one tried to separate the combatants.

Gutierrez and Villanueva fought for a minute, then Gutierrez turned away, although he did not completely turn his back on Villanueva. He was worried about what the people behind him, many of whom he did not know, might be doing. Gutierrez and Villanueva were both breathing hard from trading punches. Gutierrez, who was unarmed, thought Villanueva was trying to catch his breath, but the next he knew, he looked up and there was a pistol in his face. Gutierrez did not know from where Villanueva had produced the gun, but he feared for his life and so he grabbed it. Villanueva had his finger on the trigger at the time.

The two men wrestled for the gun, and Gutierrez fell over a shopping cart. He went down on his back, and Villanueva fell on top of him. They landed hard, and the gun came loose. Both men got to their feet and went for it. Gutierrez bent down, and as he was picking it up, Villanueva kicked him in the face. Gutierrez's finger was on the trigger when he got kicked, and he unintentionally fired. He did not mean to shoot Villanueva. Gutierrez only pulled the trigger one time, but bullets came out "kind of like a machine gun." There was no pause between any of the shots. Gutierrez could not control the gun, which was going off as it was being raised. Villanueva turned and fell. Gutierrez could not tell if he was shot. Neither Gutierrez nor anyone he saw put the gun to Villanueva's head and pulled the trigger.

Gutierrez's ears started ringing when the gun went off, and he was "kind of blacked out" and had blurred vision from the kick. Everyone was screaming, and he dropped the gun and ran. He went to his car, and Saldana also got in. [N.14] Gutierrez did not know where Tapia was. Gutierrez dropped Saldana off by a church and left. He never made it to Ranch Burger or to deliver the marijuana.

[N.14] Saldana had not been involved in the fight in any way.

Gutierrez was afraid for his wife and children. He feared both retaliation and the police. He left Turlock and ended up in San Jose. He burned the car not to destroy evidence, but because the registered owner could not make the payments. He himself was burned while doing this.

Gutierrez was arrested in Sacramento. Once he was in custody in Stanislaus County, he learned that as someone affiliated with the Norteño gang who came into custody for allegedly hurting another Norteño, he was supposed to answer a number of questions. Saldana actually wrote the wila bearing Gutierrez's name, but Gutierrez provided the information on it. Answering the questions was mandatory.

Gutierrez was not aware of any difference between being affiliated with a gang and being a gang member. On March 22, he considered himself a Norteño gang member. Respect was important to him as a gang member, including with regard to the way his gang member peers viewed him.

Gutierrez explained that to a gang member, a degenerate is someone who is no longer associating with the gang. It is not a bad thing. A degenerate can "hang out" with an active member. Gutierrez was not sure what happens when a degenerate disrespects an active gang member in public in the presence of other gang members. For the gang member who is disrespected in public to do nothing but walk away may lead to repercussions such as discipline. However, Gutierrez

14

would not necessarily be looked on as a coward or as letting the gang down if he let a degenerate punch him in front of other gang members and then just walked away.

Gutierrez denied that either the fight at the wedding reception or the shooting had anything to do with a gang. Perez molested Gutierrez's cousin when she was seven years old, 20 years or more ago. A known child molester cannot affiliate with Norteños, but only the family was aware of the molestation. Villanueva previously threatened Gutierrez's family and pulled guns on him. The information contained in the wila concerning what Villanueva had done was accurate. It was not Gutierrez's attempt to clear himself for an unauthorized killing of a Norteño; he did not feel threatened in any way by the Norteño gang after killing another Norteño without authorization from the gang.

Saldana testified that he was 26 years old at the time of trial and had lived with Gutierrez all his life. He did not have a good memory of what happened at the wedding reception, because he was knocked out. He recalled Gutierrez and Perez having words outside the reception hall, and Perez saying to Gutierrez, "Let's talk," and motioning with his head. Saldana told Gutierrez that if Perez had something to say, he could say it right there. Because of past problems, Saldana assumed they were going to fight, and he did not think they should be fighting right then and messing up Tommy's wedding. Saldana recalled there being a fight between Gutierrez, Perez, and Villanueva, but did not remember who threw the first blow or how long he himself was unconscious. He just remembered walking to the car afterward and leaving.

In May 2008, Saldana was living on Geer, in Turlock, with his wife and son. On May 25, he went to his mother's house and did some yard work for her. He then drove with Gutierrez to Tapia's house. Saldana did not know anything about any marijuana until he saw the package and asked what was in it. There was no talk about the fight at the wedding reception or doing anything to Villanueva. Saldana did not even know if Villanueva was in Turlock that day and knew nothing about any barbecue or anything going on at the cemetery. He did not conspire with Tommy or anyone else to try to get Villanueva to be at the barbecue. Saldana was not armed and did not see a gun possessed by anyone.

After leaving Tapia's house, they were going to go eat at Ranch Burger off of Lander. They stopped on Angelus, however, because Tapia saw Tommy and wanted to see what new shoes he had. Tapia walked up to Tommy, while Saldana and Gutierrez got out of the car and walked over to where everyone else was, in front of the duplexes. Saldana did not recognize anyone there.

Saldana had never had a physical encounter with Villanueva other than at the wedding reception. As he and Gutierrez stood by the gate, Saldana heard Villanueva arguing with a man Saldana did not know. The man told Villanueva to let it go. Villanueva was looking in the direction of Saldana and Gutierrez.

Saldana and Villanueva did not speak to each other, but Villanueva told Gutierrez, "Let me holler at you," and then walked into the backyard. There were 40 or 50 people around, and Saldana understood it to be a challenge to fight. He did not hear Eloisa yell anything.

Gutierrez followed Villanueva into the back, as did people who had been standing there. As they walked to the backyard, Villanueva took off his jacket, hat, and chain. Everyone formed a circle around Villanueva and Gutierrez. Villanueva

handed his stuff to someone, then turned around and rushed Gutierrez. Villanueva threw the first punch, then they started fighting. Saldana did not try to help Gutierrez, because it was one on one. Although Gutierrez was outweighed, Saldana was not afraid for him because Gutierrez could hold his own. No one else tried to intervene, but instead just cheered the fighters on. Villanueva was landing the most punches.

There was a pause in the fight, then Saldana saw Villanueva pull a pistol from his waistband and put it in Gutierrez's face. Gutierrez quickly grabbed it. He and Villanueva started wrestling for it and tripped over a shopping cart. Gutierrez fell back and Villanueva fell on top of him, and the gun came loose. Gutierrez and Villanueva scrambled to their feet, looking around, and Gutierrez went for the pistol. He was bent over, picking up the gun from the ground, when he got kicked in the face. Saldana saw Gutierrez come up with the gun and heard seven or eight shots fired all together. [N.15] Saldana saw Villanueva get hit and kind of spin around. It appeared to Saldana that when the firearm discharged, Gutierrez was defending himself.

> [N.15] Saldana was guessing at the number of shots. There was no pause, like Alicia testified; "[w]hen the gunshots stopped, they stopped."

The gunshots frightened Saldana, so he turned around and ran out of the backyard. When he got to the street, he saw Gutierrez running out of the backyard toward the car. Gutierrez was holding his face. He did not have a gun.

Saldana denied shooting Villanueva, setting him up, or being part of a plan to lure him into the backyard. He admitted being a Norteño gang member, but denied the shooting was gang related.

Saldana admitted writing in the wila that he was told by some of the "younger homies" that they made up a gang called Turlocos, but some individuals from Varrio West Side Turlock, including Villanueva, told them they were not allowed "to represent it" because the only gang in Turlock was VWST. Saldana stated in the wila that he was told the whole purpose of starting Turlocos was to unite all the youngsters who were fighting among themselves, but the individuals he mentioned started jumping the "younger homies." As a result, Saldana told the individuals from VWST that that was "red on red" and "not cool." Ever since then, Villanueva and the others did not like him. The wila related how Villanueva, Bullet G, and some of the others told Saldana's wife they were going to kill Saldana and Gutierrez. It also related that Villanueva tried to start a fight with Saldana and Gutierrez three times at a wedding. At the end of the wedding, Villanueva called some of his friends who were known dropouts and degenerates, and they pulled up in a car driven by Anthony Fuentes ("Chubbs"), who "snitched" on Saldana for carjacking in 2004. Perez, Bullet G, and a number of others surrounded Saldana and Gutierrez, and Saldana was struck and knocked out by Villanueva, who then continued to kick him in the face while Saldana was unconscious.

Everything Saldana wrote in the wila about Villanueva was accurate, but Saldana did not hate him at the time of the shooting. Saldana denied ever making a shooting gesture at Villanueva. He attempted to listen to everything to which the prosecution's gang experts testified. He did not know all of the "stuff" they said about the Norteño gang.

People v. Gutierrez, No. F062970, 2013 WL 4523566, at *1–14 (Cal. Ct. App. Aug. 26, 2013).

16

### III.    DISCUSSION

     A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

     B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

1   explained that an "unreasonable application" of federal law is an objective test that turns on

2   "whether it is possible that fairminded jurists could disagree" that the state court decision meets

3   the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an

4   *unreasonable* application of federal law is different from an *incorrect* application of federal

5   law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a

6   writ of habeas corpus from a federal court "must show that the state court's ruling on the claim

7   being presented in federal court was so lacking in justification that there was an error well

8   understood and comprehended in existing law beyond any possibility of fairminded

9   disagreement." Harrington, 131 S.Ct. at 787-788.

10       The second prong pertains to state court decisions based on factual findings.  Davis v.

11   Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under §

12   2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

13   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

14   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

15   U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable

16   when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see

17   Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543

18   U.S. 1038 (2004).

19       To determine whether habeas relief is available under § 2254(d), the federal court looks to

20   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

21   Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

22   2004).  "[A]lthough we independently review the record, we still defer to the state court's

23   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

24       The prejudicial impact of any constitutional error is assessed by asking whether the error

25   had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

26   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120

27   (2007)(holding that the Brecht standard applies whether or not the state court recognized the error

28   and reviewed it for harmlessness).

18

1    C.    Review of Petition

2         The instant petition presents the following grounds for relief: 1) The jury instruction on

3    aiding and abetting liability failed to instruct the jury that Petitioner must share the same specific

4    intent as the perpetrator in order to be found guilty as an aider and abettor; 2) The trial court erred

5    by failing to exclude the coerced testimony of prosecution witness Jorge Tapia; 3) Allowing the

6    gang expert to testify to Petitioner's prior bad acts violated his Sixth Amendment right to

7    confrontation and his federal due process right to a fair trial; 4) The gang expert's testimony

8    concerning the prior bad acts of Petitioner and his codefendant constituted unreliable hearsay that

9    was more prejudicial than probative in violation of his due process right to a fair trial; 5) The trial

10   court erred by failing to redact highly prejudicial statements from the wila written by Petitioner;

11   6) The prosecutor committed misconduct by telling the jury in closing argument to "send a

12   message to the Norteño street gang"; 7) The security measures taken by the trial court violated

13   Petitioner's right to a fair trial; 8) The evidence was insufficient to support the finding that the

14   offense of murder was committed for the benefit or, at the direction of, or in association with, a

15   criminal street gang with the specific intent to promote, further, and assist in criminal conduct by

16   gang members; 9) California law imposes a drastically greater punishment upon aiders and

17   abettors of street gang crimes versus those who commit other crimes in violation of Petitioner's

18   equal protection rights; 10) Appellate counsel rendered ineffective assistance by failing to raise

19   numerous meritorious issues on appeal; 11) Defense counsel rendered ineffective assistance for

20   various acts and omissions; and 12) Counsel for co-defendant was a person of interest named in a

21   murder investigation at the time of trial.  (Doc. No. 1 at pp. 5-45.)

22        *1.  Claim One – Instructional Error*

23        Petitioner first alleges that the jury instruction on aiding and abetting liability was

24   insufficient because it failed to instruct the jury that it had to find that the aider and abettor had

25   the same specific intent to kill as the perpetrator.  The claim was raised on direct review and the

26   Fifth DCA provided the last reasoned decision, as follows:

27        Saldana contends the instructions on aiding and abetting—specifically, CALCRIM
         No. 401—erroneously failed to require the jury to make a finding of Saldana's
28       mens rea separate from that of the perpetrator. He says that in order to convict an

                                      19

aider and abettor of murder, the jury must find he or she had the individual specific intent to kill; hence, by refusing Saldana's requested modification of the instruction, the trial court committed federal constitutional error by omitting or at least misdescribing an element of the offense. The Attorney General says the jury was properly instructed. We agree with the Attorney General.

### A. Background

During the jury instruction conference, the trial court stated its intent to give CALCRIM No. 400 (Aiding and Abetting: General Principles) and CALCRIM No. 401 (Aiding and Abetting: Intended Crimes). Although there was no objection to CALCRIM No. 400, counsel for Saldana objected that CALCRIM No. 401 was "inadequate" because it failed to say the aider and abettor had to share the intent of the perpetrator, meaning "the person has to have the same specific intent here, the specific intent to kill." When the court expressed its belief the instruction said what was necessary, counsel responded that he did not believe it was clear enough. Counsel for Saldana requested that the second element, which read, "The defendant knew that the perpetrator intended to commit the crime;" be modified to state, "The defendant knew that the perpetrator intended to commit the crime with the same specific intent to kill, and does, in fact, aid and facilitate, promote, encourage." The court refused the proposed modification, but stated Saldana was nevertheless free to argue the point to the jury.

The trial court subsequently instructed the jury in the language of CALCRIM No. 400 as follows:

> "A person may be guilty of a crime in two ways:

> "One, he or she may have directly committed the crime. I will call that person the perpetrator.

> "Two, he or she may have aided and abetted a perpetrator who directly committed the crime.

> "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

This was immediately followed by CALCRIM No. 401, to wit:

> "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

> "One, the perpetrator committed the crime;

> "Two, the defendant knew that the perpetrator intended to commit the crime;

> "Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

> "And, four, the defendant[']s words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

> *"Someone aid [ ]s and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to, and does, in fact,*

20

*aid, facility [sic], promote, encourage, or instigate the perpetrator's commission of that crime.*

"If all of these requirements are proved, the defendants not need [sic] to have actually been present when the crime was committed to be guilty as an aider and abett[o]r.

"If you conclude that a defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact to determine whether the defendant was an aider and abett[o]r.

"However, the fact that a person is present at the scene of a crime or failed to prevent the crime, does not by itself make him or her an aider and abett [o]r." (Italics added.)

**B.   Analysis**

"Even without a request, a trial court is obliged to instruct on '"general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case"' [citation].... In particular, instructions delineating an aiding and abetting theory of liability must be given when such derivative culpability 'form[s] a part of the prosecution's theory of criminal liability and substantial evidence supports the theory.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 488.) "[T]he State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. [Citation.] Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.)

"'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.'" (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 831; see also *People v. Tate* (2010) 49 Cal.4th 635, 696 [applying reasonable likelihood standard to "claim of instructional error or ambiguity"].) [N.42] "'"Finally, we determine whether the instruction, so understood, states the applicable law correctly." [Citation.]' [Citation.] We independently assess whether instructions correctly state the law. [Citation.]" (*People v. Lopez, supra*, 199 Cal.App.4th at p. 1305.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

[N.42] Recently, in *People v. Pearson* (2013) 56 Cal.4th 393, 476, the California Supreme Court stated that in determining the meaning the instructional charge conveys, "the question is, how would a reasonable juror understand the instruction. [Citation.]" As authority for this proposition, the court cited *California v. Brown* (1987) 479 U.S. 538, 541. In *Boyde v. California* (1990) 494 U.S. 370, 379–380, however, the United States Supreme Court observed that a number of its cases (including *California v. Brown*) had used numerous different phrasings, and made it a point to settle on the "reasonable likelihood" standard as the single standard of review for jury instructions. In *Estelle v. McGuire* (1991) 502

U.S. 62, 72–73, footnote 4, the United States Supreme Court reaffirmed its commitment to the "reasonable likelihood" standard, and disapproved the standard of review language contained in *Cage v. Louisiana* (1990) 498 U.S. 39, 41 ("In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole") and *Yates v. Evatt* (1991) 500 U.S. 391, 401 ("We think a reasonable juror would have understood the [instruction] to mean ..."). We need not decide whether our state Supreme Court misspoke in *Pearson*, since our conclusion is unaffected in any event.

After independent review, we find no error.

The seminal case concerning the definition of aiding and abetting as it currently stands in California is *People v. Beeman* (1984) 35 Cal.3d 547 (*Beeman*). There, the state high court declared:

> "[W]e conclude that the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]
>
> "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the actus reus of the crime [citation], *the aider and abettor must share the specific intent of the perpetrator*. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, *an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.* [Citation.]" (*Beeman, supra*, 35 Cal.3d at p. 560, original italics omitted, italics added.)

The court went on to say: "[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Id.* at p. 561.)

*Beeman's* definition of aiding and abetting, and of what it means to share the perpetrator's specific intent, remains good law to this day. (See, e.g., *People v. Delgado, supra*, 56 Cal.4th at p. 486; *People v. Houston, supra*, 54 Cal.4th at p. 1224; *People v. Marshall* (1997) 15 Cal.4th 1, 40; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) CALCRIM No. 401, as given here, adequately conveys those principles. (See *People v. Houston, supra*, 54 Cal.4th at p. 1224.)

Saldana claims, however, the instruction failed to tell jurors that, for Saldana to be liable for murder, he must—independently of Gutierrez—have the specific intent to kill.

Although "[a]ll persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, ... are principals in any crime so committed" (§ 31), "[t]he mental state necessary

22

for conviction as an aider and abettor ... is different from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged.... An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122–1123, quoting *Beeman, supra*, 35 Cal.3d at p. 560.)

An aider and abettor's guilt for an intended crime "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) [N.43] Thus, the California Supreme Court has "defined the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116–117.) "When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense—[murder]—are the same, ... is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy, supra,* 25 Cal.4th at p. 1118, fn. omitted.) "Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, [he] says in essence, "your acts are my acts...." ' [Citations.] But that person's own acts are also [his] acts for which [he] is also liable. Moreover, that person's mental state is [his] own; [he] is liable for [his] mens rea, not the other person's.'' (Ibid.)

> [N.43] "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*People v. McCoy, supra*, 25 Cal.4th at p. 1117.) Only the intended crime is at issue here; accordingly, nothing we say takes into account natural and probable consequences.

In the present case, jurors were instructed on first and second degree murder, justifiable homicide based on self-defense, accident, and voluntary manslaughter based on sudden quarrel or heat of passion. They were also told to separately consider the evidence as it applied to each defendant, and that they must decide each charge for each defendant separately. Further, they were instructed that in order to convict a defendant of first degree murder, they had to find, inter alia, intent to kill and premeditation.

Pursuant to CALCRIM No. 401, in order to find Saldana guilty of first degree murder based on aiding and abetting that crime, jurors had to find proven beyond a reasonable doubt that Gutierrez committed first degree murder; Saldana knew Gutierrez intended to commit first degree murder; before or during the commission of first degree murder, Saldana intended to aid and abet Gutierrez *in committing first degree murder*; and Saldana's words or conduct did in fact aid and abet Gutierrez's commission of first degree murder. CALCRIM No. 401 further

1

2

explained that Saldana aided and abetted first degree murder if he knew of Gutierrez's unlawful purpose—the commission of intentional, premeditated murder—and he specifically intended to, and did in fact, aid, facilitate, promote, encourage, or instigate Gutierrez's commission of such murder. (See *People v. Mendoza, supra*, 18 Cal.4th at p. 1123.)

3

4

In our view, the instructions as a whole clearly and unmistakably required the jury to make an individual determination of Saldana's mental state. Saldana says he might have known Gutierrez had the intent to kill, but might not have had the same intent. This is true. However, CALCRIM No. 401 required jurors to find not only that Saldana knew of Gutierrez's intent to kill, but also that Saldana intended to aid and abet Gutierrez in committing murder. This, considered with the instructions on lesser and justifiable forms of homicide, manifestly required jurors to consider Saldana's mental state separate and apart from Gutierrez's mental state. [N.44] Significantly, CALCRIM No. 400, as given here, did not tell jurors, misleadingly, that a person is equally guilty of the crime of which the perpetrator is guilty whether he or she committed it personally or aided and abetted the perpetrator. (See *People v. Samaniego, supra*, 172 Cal.App.4th at pp. 1164–1165.)

5

6

7

8

9

10

11

12

13

14

15

[N.44] "Murder includes both actus reus and mens rea elements." (*People v. Concha* (2009) 47 Cal.4th 653, 660.) The actus reus element requires that an act of either the defendant or an accomplice be the proximate cause of death. The mens rea element requires that the defendant *personally* act with malice aforethought. (*Ibid.*; *People v. McCoy, supra*, 25 Cal.4th at p. 1118.) As a practical matter, "[i]t would be virtually impossible for a person to know of another's intent to *murder* and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166, italics added; see *People v. Lee* (2003) 31 Cal.4th 613, 624.)

16

17

18

19

20

21

22

23

We recognize CALCRIM No. 401 does not use the word "share" or explicitly state that in order for an aider and abettor to be liable for murder, he must—independently of the perpetrator—have the specific intent to kill. [N.45] (See *People v. Acero* (1984) 161 Cal.App.3d 217, 224–226.) This does not mean there exists a reasonable likelihood the jury was misled, however. "Implicit in the notion of someone 'sharing' another's intent is knowledge of that intent and harboring the same purpose oneself." (*People v. Williams* (1997) 16 Cal.4th 635, 676.) What matters is not the specific words used, but rather "that the jury receive an accurate description of the required state of mind. [Citation.]" (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1104–1105.) The instructions here conveyed that description, and the arguments of counsel reinforced the instructions. Since the meaning the instructions communicated to the jury was unobjectionable, "the instructions cannot be deemed erroneous. [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 801; accord, *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

24

25

[N.45] For that matter, neither does the version of CALJIC No. 3.01 that has been in effect for years.

26

People v. Gutierrez, 2013 WL 4523566, at *40–43.

27

Initially, the Court notes that a claim that a jury instruction violated state law is not

28

cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain

24

federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

Petitioner claims that the jury instruction, CALCRIM No. 401, failed to instruct the jury to determine whether Petitioner had the same specific intent as the perpetrator.  As noted above, the Fifth DCA determined the instructions as given on the whole comported with state law.  The court noted that California law requires the aider and abettor to share the specific intent of the perpetrator.  The court explained that "an aider and abettor will 'share' the perpetrator's specific intent when he or she know the full extent of the perpetrator's criminal purpose and gives aid or

1    encouragement with the intent or purpose of facilitating the perpetrator's commission of the

2    crime." People v. Beeman, 35 Cal.3d 547, 560 (1984).  The court then found that the instruction

3    given, CALCRIM No. 401, adequately conveyed these principles.  Pursuant to CALCRIM No.

4    401, in order to find Petitioner guilty based on aiding and abetting, jurors had to find beyond a

5    reasonable doubt that Gutierrez committed first degree murder; Petitioner knew Gutierrez

6    intended to commit murder; Petitioner intended to aid Gutierrez before and during his

7    commission of the murder; Petitioner intended to aid and abet Gutierrez in committing first

8    degree murder; and Petitioner's words or conduct did in fact aid and abet Gutierrez in his

9    commission of murder.  Gutierrez, 2013 WL 4523566, *43.  Thus, the appellate court determined

10   that the instructions as a whole clearly and unmistakably required the jury to make an

11   individualized determination of Petitioner's mental state.  Id.  Since the appellate court

12   determined that the instructions comported with California law, and the mental state required for

13   aiding and abetting liability is a matter of state law, federal habeas relief is foreclosed.  Estelle,

14   502 U.S. 62, 68 ("We have stated many times that federal habeas corpus relief does not lie for

15   errors of state law.").

16        Even if this Court reviewed the instruction, Petitioner's claim would fail.  CALCRIM No.

17   401, as given by the trial court, instructed the jury that it must find that the perpetrator committed

18   the crime, Petitioner *knew* that the perpetrator intended to commit the crime; Petitioner, both

19   before and during commission of the crime, *intended to aid and abet* the perpetrator in

20   committing the crime; and Petitioner's words or actions did in fact aid and abet the perpetrator's

21   commission of the crime.  Gutierrez, 2013 WL 4523566, *40.  The jury was further instructed

22   that someone aids and abets a crime "if he or she *knows* of the perpetrator's unlawful purpose,

23   and he or she *specifically intends* to, and does, in fact, aid, facility [sic], promote, encourage, or

24   instigate the perpetrator's commission of that crime."  Id (emphasis added).  Petitioner fails to

25   demonstrate that the jury was not sufficiently instructed on the requirements under California law

26   concerning the mental state of the aider and abettor.  Accordingly, Petitioner's claim of

27   instructional error should be rejected.

28   ///

*2.  Claim Two – Failure to Exclude Witness Testimony*

Petitioner next claims that the trial court erred by failing to exclude the allegedly coerced trial testimony of prosecution witness Jorge Tapia.  Petitioner raised this claim on direct review, and the Fifth DCA provided the last reasoned decision, as follows:

> Defendants say Tapia's trial testimony was coerced, and was the product of a coerced police statement. As a result, they claim, its admission violated their due process right to a fair trial. We conclude the testimony was properly admitted.
>
> *1.  Background*
>
> Tapia's trial testimony is summarized in the statement of facts, *ante*. Before he testified, Gutierrez requested an Evidence Code section 402 hearing concerning the voluntariness of Tapia's pretrial statement and trial testimony. [N.17]
>
> > [N.17] In addition to arguing the claim fails on the merits, the Attorney General says Saldana forfeited his claim because the record does not show he objected or joined in Gutierrez's objections to Tapia's testimony. We recognize that "[a] claim of coercion is not cognizable on appeal in the absence of an objection to the testimony at trial" (*People v. Kennedy* (2005) 36 Cal.4th 595, 612, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459), and failure to join in the objection of a codefendant generally constitutes a forfeiture of the issue on appeal (*People v. Wilson* (2008) 44 Cal.4th 758, 793). However, "[i]n requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error. [Citation.]" (*People v. Kennedy, supra*, 36 Cal.4th at p. 612.) Here, the record shows that, although counsel for Gutierrez took the lead in presenting the issue, the trial court and prosecutor treated the objection as having been made by both defendants. Under these circumstances, we find no forfeiture.
>
> At the Evidence Code section 402 hearing, Tapia was represented by Attorney John Hillenbrand. On direct examination by the prosecutor, Tapia testified that Hillenbrand also represented him at the time of the preliminary hearing. At the preliminary hearing, Tapia invoked his Fifth Amendment rights. At that time, however, he did not have any agreement with the prosecution. After the preliminary hearing, the prosecutor entered into a written agreement with Tapia, whereby Tapia would not be prosecuted for any of the events leading up to the murder of Villanueva, including providing the firearm to Gutierrez, and anything that occurred at the Angelus Street address. Tapia signed the agreement, after consultation with his attorney, because he believed it was the right thing to do.
>
> Tapia testified that he recalled some of the interview he had on June 11, 2008, with Bertram and Bunch. He was not shackled or handcuffed, no weapon was pointed at him, and he gave the statement of his own free will. Tapia did not recall Bertram saying he could leave any time he wanted and they would give him a ride back home, although that was reflected in the transcript. Tapia "believe[d]" he told Bertram what he knew about the events of May 25, 2008, although at the time, he had not been promised immunity. To the best of his ability, he provided a truthful statement to the officers. Asked if he was testifying of his own free will, Tapia

responded, "I'm doing this because I guess I have to."

On cross-examination, Tapia testified that in June 2008, the police left a card on his door. He called them back. He was subsequently taken down to the police department. Prior to that, he had not told his mother anything about the shooting. He recalled Bertram mentioning that he knew her, but did not recall him saying several times during the interview that he was going to have a talk with Tapia's mother.

Tapia did not recall Bertram or Bunch telling him that he was lying, that he was at a crossroads, or that his future was at issue. He acknowledged, however, that the transcript of the interview reflected Bunch saying, "You want to do the right thing. It's okay. It's very important. This day is your day. Right now. This second. You are standing right now at a crossroads," and "So it's very important for your future."[N.18] The transcript also showed Bertram saying, "We talked to your mom before we came over here, but I don't think you are being honest with us. As a matter of fact, I know you're not. Because I know that within a half hour of the shooting you were on the phone with Ray." However, Tapia did not recall being told it was his future, he was at a crossroads, or to do the right thing.

> [N.18] Unlike the parties at trial, we do not have the transcript before us. It appears the court reporter used quotation marks when one of the attorneys was reading directly from the transcript. Where quotation marks are not used, we have no way of knowing whether the words accurately represent the transcript's contents.

Tapia first denied that talking to the officers was frightening. He did not know if he was going to be charged for having some involvement in the case. The transcript showed Bunch saying, "This is a crossroads for you. It seriously is. I can't stress that enough. It's a crossroad." Bertram then said, "We're right on the cusp of arresting them. Okay? And a lot of people are going to get caught up in this, and a lot of people are going to go down for their involvement." Bunch followed with, "He's not—it's no threat. It's a sure thing," whereupon Bertram said, "And I really don't think you want to go down for being involved with this at all." Tapia acknowledged the foregoing was shown in the transcript, but denied that when he was told that, he understood he could be charged in a possible murder case. The officers were just asking him questions about where he was "and stuff," and he was answering them truthfully. With respect to whether the officers kept telling Tapia that he was not being truthful, the officers were speaking very fast and Tapia could not hear everything, which was why, he thought, they said it so many times. He did not remember the officers telling him what they wanted him to say, or arguing with them that something was not as he remembered.

Tapia later admitted it had scared him to have the officers say he was involved in murder. He did not do anything, so "of course" he did not want to be charged with anything to do with the murder. He did not think that he could be charged if he did not talk to them, because he did not do anything.

Tapia invoked his constitutional right not to testify at the preliminary hearing not because he was afraid of testifying, but because he thought requiring a lawyer would be better for him. He did not understand a lot of what was going on, which was why he got a lawyer. The fact he was now testifying did not have anything to do with any sort of promise the government made to him, although he did read and understand the letter from the prosecutor to his lawyer. [N.19]

[N.19] The immunity agreement was contained in a letter from the prosecutor to Tapia's attorney.

Tapia understood the letter said his statement could result in him being prosecuted for crimes associated with Villanueva's murder. His understanding was, however, that he could only be prosecuted for such crimes if he did not say the truth. Tapia acknowledged the letter said, "Your client has represented that the statements [sic] he gave is true regarding the event and circumstances surrounding the shooting death of Roger Villanueva on May 25th, 2008." Asked if he understood the truth was supposed to be the same as the statement he gave to the officers in June 2008, Tapia replied that his understanding was, if he testified truthfully to what he remembered, he would be granted immunity. Asked if he came to court to voluntarily give a statement without any order that he do so, Tapia responded, "I just listened to my lawyer, I guess." Apart from what his lawyer told him, he was not given any order or subpoena to be present. He believed, however, that he did have to testify.

At the conclusion of the hearing, the trial court found no evidence of coercion, either with respect to Tapia's statement to Bertram and Bunch or his trial testimony. Accordingly, the court ruled Tapia would be allowed to testify before the jury.

　　　　*2. Analysis*

In *People v. Williams, supra*, 49 Cal.4th 405, the California Supreme Court stated:

> "Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion.... A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion ... if the defendant can establish that trial evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial. [Citations.] Although the out-of-court statement itself may be subject to exclusion because coercion rendered it unreliable, it is more difficult for a defendant to establish that the court should exclude the witness's trial testimony. As [the court] explained [in *People v. Badgett* (1995) 10 Cal.4th 330, 348], '[t]estimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony.' [Citation.] The burden rests upon the defendant to demonstrate how the earlier coercion 'directly impaired the free and voluntary nature of the anticipated testimony in the trial itself' [citation] and impaired the reliability of the trial testimony [citation]." (*People v. Williams, supra*, at pp. 452–453, fn. omitted.)

"On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair. [Citation.] In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)

As an initial matter, we are not convinced Tapia's statement to Bertram and Bunch was coerced. Cases involving the admissibility of a defendant's own statement are

29

instructive. In that regard, the California Supreme Court stated: "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.] 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 297–298.) "'"[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." [Citation.] In terms of assessing inducements assertedly offered to a suspect, "'[when] the benefit pointed out by the police ... is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.]' [Citation.]'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 357–358.) "'[M]ere questions, or exhortations to tell the truth or clear [one's] conscience or help [one]self by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise'" are insufficient: " '[I]ntellectual persuasion is not the equivalent of coercion.' [Citation.]" (*People v. Hill* (1967) 66 Cal.2d 536, 548–549; see also *People v. Jones, supra*, 17 Cal.4th at p. 298 [detective's telling defendant his answers could affect the rest of defendant's life did not establish coercion].)

Defendants' protestations notwithstanding, the record before us fails to show Tapia was frightened or otherwise coerced "into making a statement that was both involuntary and unreliable." (*People v. Jones, supra*, 17 Cal.4th at p. 298.) [N.20] That it may have scared him to have the officers say they thought he had something to do with a murder simply does not establish coercion.

> [N.20] Defendants suggested at trial, but never actually established through the transcript of the interview or testimony, that Bertram and Bunch told Tapia what they wanted him to say.

More importantly, even assuming an element of coercion was present in the interview, reversal is not required. Defendants have failed to demonstrate Tapia's trial testimony was coerced or rendered unreliable by any such prior coercion, or that admission of his testimony deprived them of a fair trial.

Almost three years had elapsed between the time of the interview (June 2008) and Tapia's appearance at trial (March 2011). Such passage of time serves at least partially to dissipate the coercive effect of an interrogation, especially when, as here, the witness has received immunity under an agreement that is not conditioned upon the consistency of trial testimony with an earlier statement, and the witness is represented by independent counsel. (See *People v. Williams, supra*, 49 Cal.4th at pp. 454–455.)

The immunity agreement required Tapia to testify "fully, fairly, and truthfully," not consistently with his statement to Bertram and Bunch. Under the agreement, whether Tapia's testimony was truthful would be determined by the trial judge, not the prosecutor. Whether the immunity agreement remained in effect did not depend on whether defendants were convicted.

The California Supreme Court has made it clear that "[t]here is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal

role in return for the witness's promise to testify fully and fairly. [Citations.]" (*People v. Boyer, supra*, 38 Cal.4th at p. 445.) "A prosecutor may grant immunity from prosecution to a witness on condition that he or she testify truthfully as to the facts involved. [Citation.] But if the immunity agreement places the witness under a strong compulsion to testify in a particular fashion, the testimony is tainted by the witness's self-interest, and thus inadmissible. [Citation.] Such a 'strong compulsion' may be created by a condition "'that the witness not materially or substantially change [his or] her testimony from [his or] her tape-recorded statement already given to ... law enforcement officers.'" [Citation.] [¶] On the other hand, [the high court has] upheld the admission of testimony subject to grants of immunity which simply suggested the prosecution believed the prior statement to be the truth, and where the witness understood that his or her sole obligation was to testify fully and fairly." (*Id.* at p. 455; see also *People v. Williams, supra*, 49 Cal.4th at p. 455; *People v. Badgett, supra*, 10 Cal.4th at pp. 354–355.) This is so even when the witness is legally deemed an accomplice. (*People v. Avila* (2006) 38 Cal.4th 491, 594; see § 1111.) [N.21]

> [N.21] The trial court here instructed jurors that if they determined murder was committed, then Tapia was an accomplice to that crime.

The immunity agreement here did not place Tapia under a "strong compulsion" to testify in any particular fashion. Although he was aware that if he did not testify, he could be charged in this case—something he did not wish to happen—this does not amount to coercion such that his testimony should have been excluded. (See *People v. Boyer, supra*, 38 Cal.4th at p. 445 [no improper coercion found despite witness's making clear her primary reason for cooperating at trial was prosecution's offer of immunity from prosecution as accessory to murder in return for truthful testimony].) "All immunized witnesses are offered some quid pro quo, usually an offer of leniency. [The California Supreme Court has] never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced." (*People v. Badgett, supra*, 10 Cal.4th at p. 354.)

Tapia clearly understood he was required to testify truthfully, not in a specific manner, his professed lack of memory concerning what was said during the interview notwithstanding. [N.22] Indeed, he did *not* testify in conformity with his statement to investigators concerning the key subject of the gun. "Thus defendants fail in the essential task of connecting the pressures brought to bear on the witness before trial with [his] ultimate trial testimony." (*People v. Badgett, supra*, 10 Cal.4th at p. 355.) [N.23]

> [N.22] The following exchanges occurred during Tapia's cross-examination by counsel for Gutierrez: "Q. As you sit here and testify, do you understand that you could be prosecuted for crimes associated with the supposed murder of Roger Villanueva? [¶] A. If I'm not truthful, yes, I could be prosecuted. [¶] Q. Well, if you are not truthful today or whether you are not truthful in June of 2008? [¶] A. Based on being truthful of what I remember today. [¶] Q. What you remember today; right? [¶] A. Correct." "[Q.] Then—then the next part [of the prosecutor's letter to Tapia's attorney], I want to draw your attention is—is that, if the above-stated conditions are not met or it is found that you have testified falsely or refused to testify, then the District Attorney is not bound by this agreement, and you will be—you can be prosecuted for aiding and abetting the murder of Roger Villanueva, additionally prosecuted for perjury, if applicable. Did

1    you read and understand that? [¶] A. Yes. [¶] Q. All right. So you
2    understood that if you either testified falsely or if you even refused to
     testify, you are going to be charged in the murder of Roger Villanueva;
3    isn't that true? [¶] A. Correct. [¶] Q. And you don't want to be charged that
     way, do you? [¶] A. I believe nobody wants to be charged."

4    [N.23] We note that, although defendants did not succeed in having Tapia's
5    trial testimony excluded, they fully cross-examined the parties to the
     interview (and, in the case of Bertram and Bunch, called them as defense
6    witnesses and examined them further concerning the interview), thereby
     availing themselves of "the most powerful means in [their] arsenal for
7    challenging the reliability of the witness's statements." (*People v. Williams,
     supra*, 49 Cal.4th at p. 455.)

8    Gutierrez, 2013 WL 4523566, at *14–18.

9         Under the AEDPA, Petitioner is not entitled to federal habeas relief on this claim.

10   Although the United States Supreme Court has held that a defendant's coerced confession cannot

11   be used at trial, see Jackson v. Denno, 378 U.S. 368, 385-86 (1964), "[n]o Supreme Court case

12   addresses the issue of whether coerced witness testimony can be used against a defendant at

13   trial." Trammell v. Ducart, 2015 WL 4496338, at *10 (E.D. Cal. July 23, 2015) (federal habeas

14   relief for coerced witness statement unavailable under AEDPA standard of review); see also

15   Samuel v. Frank, 525 F.3d 566, 569 (7th Cir. 2008) (United States Supreme Court "has not

16   decided whether the admission of a coerced third-party statement is unconstitutional"); Harris v.

17   Soto, 2016 WL 2587373, at *8-9 (C.D. Cal. Mar. 25, 2016), *adopted*, 2016 WL 2347825 (C.D.

18   Cal. May 3, 2016) (same).  In the absence of controlling Supreme Court law, Petitioner cannot

19   obtain federal habeas relief.  See Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of

20   holdings from this Court [on issue presented], it cannot be said that the state court

21   "unreasonabl[y] applied clearly established Federal law.") (internal brackets and citation

22   omitted).

23        Even assuming Tapia's testimony was erroneously admitted, such admission would not

24   constitute a due process violation entitling Petitioner to habeas relief.  In Holley v. Yarborough,

25   the Ninth Circuit concluded that a petitioner was not entitled to habeas relief because the Supreme

26   Court has not made "a clear ruling that admission of irrelevant or overtly prejudicial evidence

27   constitutes a due process violation sufficient to warrant issuance of the writ."  568 F.3d 1091,

28   1101 (9th Cir. 2009).

1   Furthermore, it is clear that the state court determination that Tapia's testimony was not

2   coerced was reasonable.  There is no indication in the record that Tapia was coerced, and in fact,

3   the record shows otherwise.  First, Tapia initiated contact with investigators.  (RT 546, 583.)

4   Tapia then went to the police station on his own accord.  (RT 1553-54.)  At trial, Tapia testified

5   that he provided a statement voluntarily, and that he was never threatened.  (RT 543, 609.)  In

6   addition, Tapia was thoroughly cross-examined by defense counsel concerning possible coercion.

7   (RT 600-39, 644-50, 654, 656-59, 671-76, 680-82.)

8   In any case, the police interview with Tapia was not admitted, and there is no evidence

9   that there was any coercion regarding Tapia's trial testimony.  Nearly three years had passed from

10   the time he was interviewed by police investigators.  (RT437.)  This was ample time in which

11   Tapia would have been away from the influence of detectives.  In addition, Tapia obtained

12   counsel who accompanied him to trial and assured that Tapia was not coerced.  Finally, Tapia did

13   not testify entirely consistently with his interview.  This further demonstrates that Tapia's

14   statements were not coerced.

15   Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or

16   an unreasonable application of, Supreme Court precedent.  The claim should be denied.

17   *3.   Claims Three and Four – Gang Expert Testimony*

18   In his third claim for relief, Petitioner alleges that his Sixth Amendment right to

19   confrontation and his due process right to a fair trial were violated when the trial court allowed

20   the gang expert to testify to his prior bad acts.  In his fourth claim, Petitioner alleges the gang

21   expert's testimony constituted unreliable hearsay that was more prejudicial than probative in

22   violation of his due process right to a fair trial.

23   *a.   State Court Decision*

24   In the last reasoned decision by the state courts, the Fifth DCA analyzed the claims

25   together and rejected them as follows:

26   Defendants claim their Sixth Amendment right to confrontation, and their federal
    and state due process rights to a fair trial, were violated by admission of the gang
27   expert's testimony concerning their prior bad acts. They say the hearsay relied on
    by the expert as a basis for his opinion they were members of a criminal street
28   gang was testimonial within the meaning of *Crawford v. Washington* (2004) 541

33

U.S. 36 (*Crawford* ) and was offered for the truth of the matters contained therein, yet they had no opportunity to confront the declarants. They further contend the prior-bad-acts hearsay should have been excluded because it was unreliable and more prejudicial than probative. The Attorney General argues the testimony did not violate *Crawford*, and says the remaining challenges to the evidence were forfeited by defendants' failure to object on the same grounds in the trial court. We conclude any error was harmless.

>    *1.  Background*

Gutierrez moved, in limine, to preclude expert gang testimony based on police reports, field identification reports, jail records, and the like, on the ground such testimony would violate his Sixth Amendment right of confrontation under *Crawford* and its progeny. He asserted the erroneous admission of such evidence would prejudice his right to a fair trial, as gang evidence has an inherent prejudice and creates a risk the jury will infer defendant has a criminal disposition and is, therefore, guilty of the alleged offense. Saldana joined in the motion.

After argument, during which the prosecutor asserted the type of evidence defendants were challenging was prejudicial but also extremely probative, the trial court observed that even if it were to rule as a general matter that the gang expert could rely on hearsay information as the basis for his opinions, that hearsay had to be reliable. The court surmised that before the gang expert was allowed to testify, it "may be ... that we're going to conduct a further hearing as to the basis of his opinions, and the Court may have to rule that some, none, or all of the things ... upon which he bases his opinion aren't reliable. [¶] ... [¶] ... I don't know that." After additional argument, the following took place:

>    "THE COURT: ... I think, in general, the case that I cited [*People v. Ramirez* (2007) 153 Cal.App.4th 1422], plus the case cited in that, the *Thomas* case [*People v. Thomas* (2005) 130 Cal.App.4th 1202], at least gives me, as the trial Court, the very clear impression ... that *Crawford* does not prohibit an expert from relying on certain hearsay evidence.

>    "It's still the rule that it has to be reliable hearsay evidence. And it is still the rule that the expert's testimony must be based, at least in part, on his or her own personal knowledge. [¶] ... [¶] Unfortunately, this motion is just painted with a very broad brush. It says they can't do this under *Crawford*. Well, there are certain things that can be done under *Crawford*. There are certain things that can't be, whether it is under *Crawford* or general rulings of evidence as to the admissibility of hearsay in general, and hearsay as relied upon by an expert.

>    "*I cannot make a blanket ruling on this issue. And, unfortunately, it is going to have to be handled on a piecemeal basis as each type of evidence is being introduced or attempted to be introduced.*

>    "So all I'm saying at this point is, I'm not going to make a ruling that *Crawford* prohibits an expert from testifying as to certain hearsay. *But there are still requirements that the People have to meet before that hearsay can be relied upon and testified to.* [¶] ... [¶] ... *So at this point, ... all I'm saying is that I'm not going to make a blanket ruling* that *Crawford* prohibits the use of hearsay. It does in certain circumstances. It does not in other circumstances. So we're just going to have to take it one by one and go from there." (Italics added.)

As previously described, Investigator Mariscal of the district attorney's office testified as an expert on gangs. He explained that in preparation for his testimony in a trial like this, he reads the case and then conducts an investigation into the defendants. He pulls all police reports in which they have been listed or contacted, field interview cards from different police departments, probation records, and school records if he finds them. His purpose is to conduct a thorough investigation of the individuals, their backgrounds, and their gang involvement, if any. He did not automatically conclude something was a gang crime simply because gang members were involved.

In his written gang workup, Mariscal listed a total of 13 incidents under the heading, "Activity for Ray Gutierrez." The information formed part of the basis of his opinion in the case, both as to gang membership and gang benefit. The incidents and sources of information to which Mariscal testified, were:

(1) Turlock Police Department No. 99–0773: On January 30, 1999, Turlock police officers responded to a hardware store in Turlock regarding a shooting. Four individuals had been shot at by the passenger of a vehicle. Gutierrez was identified as the shooter. A search of his residence revealed a stolen .25–caliber handgun.

(2) Turlock Police Department No. 01–683: On January 23, 2001, a Turlock police officer responded to the area of Spruce and Angelus in Turlock in response to a report of a reckless driver. When the vehicle was stopped, the front passenger fled on foot. Gutierrez was one of the rear passengers. A stolen .22–caliber handgun was found underneath the right front passenger seat, and marijuana, a glass methamphetamine pipe, and a knife were found in the backseat.

(3) Turlock Police Department No. 01–2814: On March 31, 2001, Turlock police officers responded to a bar regarding a large crowd gathering in the parking lot. Shots were fired, and a security guard pointed out a black Cadillac as being responsible for the shooting. A witness identified Gutierrez as the passenger in the car and the person responsible for shooting four times into the air. The witness said Gutierrez and the car's driver had gotten into a fight with some other males at the bar. Another witness heard Hispanic males claiming West Side.

(4) Stanislaus County Auto Theft Task Force (StanCATT) Nos. 01–6427 and 01–6744: On August 2, 2001, task force agents stopped a stolen vehicle at Angelus and Spruce. Gutierrez was the front passenger. A methamphetamine pipe with a useable amount of methamphetamine was located on the front passenger side floorboard, where Gutierrez was sitting.

(5) Turlock Police Department No. 04–3475: On April 4, 2004, a Turlock police officer responded to a medical center in Turlock regarding a shooting victim. There, he contacted Gutierrez, who reported he had been approached by four males, one of whom pointed a gun at his face. Gutierrez reached up and grabbed the gun, which discharged into his left hand. Gutierrez told the officer he had claimed West Side Turlock Norteño for six years, but no longer claimed it.

(6) Turlock Police Department No. 04–9570: On September 21, 2004, Gutierrez was involved in a fight in Turlock in which the victim was injured. Gutierrez fled, but later turned himself in. He stated he used to be

35

involved in gangs, but had not been for the last seven years.

(7) StanCATT report listed under CHP No. F–19–465–08: On January 9, 2008, task force officers located a stolen vehicle in an apartment complex. They observed Gutierrez drive up. One of his passengers drove the stolen vehicle away, followed by the car Gutierrez was driving. Both vehicles were stopped and the occupants arrested. While being booked into jail, Gutierrez and one of his passengers admitted being Norteños. Another passenger was wearing a red belt.

(8) Modesto Police Department No. 07–73364: On August 3, 2007, Gutierrez was in a vehicle driven by a Norteño gang member. Also present in the car, which had the personalized license plate "Turloco," were Saldana and two other males.

(9) Turlock Police Department No. 07–11403: On November 21, 2007, officers responded to the area of Vermont and Spruce Streets, because Mylo Lopez reported the driver of a gold Chrysler Concord had pointed a gun at him. Officers located the vehicle, which was driven by Gutierrez, but did not find a handgun when they searched the car and then could not locate Lopez. Gutierrez was arrested for driving on a suspended driver's license.

(10) Turlock Police Department No. 08–2844: On March 23, 2008, an officer was dispatched to Vermont Street in response to an anonymous report of two subjects, whom the reporting party said were "June Bug" and Raymond, firing a weapon from a moving burgundy Mustang. Officers conducted a high-risk stop on the vehicle; Gutierrez was the driver, and the passenger was Joseph Gonzales, also known as June Bug. No weapon was found in the vehicle, but Gutierrez was arrested for driving on a suspended license. Gonzales, a documented Norteño, was arrested for a parole violation.

(11) Turlock Police Department No. 08–4312: On May 5, 2008, an officer was dispatched to a call of a suspicious vehicle. Gutierrez was found in the same white Nissan Altima as was involved in the present case. A search of the vehicle revealed 390 pseudoephedrine pills. Gutierrez was arrested for two warrants and possession of the pills.

(12) Turlock Police Department No. 08–4975: The current offense.

(13) Booking information from June 12, 2008: When booked into the county jail, Gutierrez claimed South as his enemies in jail who might harm him. He also responded yes and said Norte when asked if he affiliated with a gang.

As described in the statement of facts, *ante*, Mariscal opined that, on the date Villanueva was shot, Gutierrez was a Norteño gang member.

Mariscal based this opinion on everything he reviewed involving Gutierrez.
Prior to Mariscal testifying specifically as to Saldana, Saldana requested, and was granted, a continuing objection on confrontation clause grounds. [N.24] The trial court cautioned: "I don't want you to be misled that that means any other objections that stated don't need to be stated."

[N.24] The reporter's transcript reflects counsel for Saldana asked for a "consultation clause" objection. When Mariscal began to testify concerning his review of Saldana's activities, however, counsel again objected to the line of questioning as a violation of the confrontation clause, and the trial court confirmed Saldana had a continuing objection—overruled for the reasons stated pretrial—on that ground.

Mariscal testified that his investigative report contained the following incidents and sources of information concerning Saldana:

(1) Turlock Police Department No. 98–9638: On November 21, 1998, when Saldana was approximately 14 years old, a teacher at Turlock Junior High School caught him and another student spray-painting Norteño-related graffiti on school walls. The students were arrested for vandalism.

(2) Modesto Police Department No. 99–21601: On March 15, 1999, an officer attempted to stop a stolen vehicle in which Saldana was one of the passengers. After a pursuit, those in the car were arrested. Saldana was charged with conspiracy and auto theft. The vehicle's interior was spray painted with "14" and "X4," and "Norteño" was scratched in the dash.

(3) Turlock Police Department No. 00–96: On January 4, 2000, Saldana and a gang member were arrested after they were identified by the victim of an attempted residential burglary. Saldana acted as the lookout. Both were arrested for attempted burglary and conspiracy.

(5) [N.25] Merced Sheriff's Department No. 00–17441: On June 18, 2000, a deputy was dispatched to Hilmar for a report of juveniles vandalizing a residence. Upon arrival, he saw a white Ford Escort flee the area at a high rate of speed. When the vehicle was stopped, it was found to have been stolen. Saldana was the driver. One of the six passengers was Anthony Fuentes (Fuentes), whom Saldana identified in his wila as having snitched on him for carjacking. All were arrested for possession of stolen property, and Saldana was also arrested for reckless driving and driving without a license.

> [N.25] For unknown reasons, no testimony was elicited concerning incident number 4.

(6) Turlock Police Department No. 00–9172: On November 7, 2000, Fuentes was stopped by police while driving a stolen vehicle and was arrested for auto theft, possession of stolen property, and driving without a license. He said Saldana had given him the car and car keys earlier that day. Saldana was then arrested for vehicle theft.

(7) Probation report by Probation Officer Delgado: On May 2, 2001, Saldana admitted his moniker was Tito and that he began associating with Norteños while in junior high. Saldana said, however, he was no longer associated.

(8) Modesto Police Department No. 02–46694: On April 26, 2002, an officer stopped a vehicle driven by Michael Perez. Saldana and Fuentes were passengers. Both were arrested for warrants.

(9) Notation by Probation Officer Garcia: On May 29, 2002, Saldana said

37

the four dots on his hand indicated being a Northerner. He admitted associating with Norteños.

(10) Turlock Police Department No. 02–10424: On October 29, 2002, officers were dispatched to a shots-fired call in the 700 block of Angelus Street. The victim reported that her nephew, Saldana, had shot at her, after she got into an argument with Saldana and Fuentes. Another witness saw Saldana with an arm extended, pointing toward the area of the victim, then he heard a gunshot. Saldana was arrested for assault with a firearm. A latex balloon containing ten .22–caliber bullets was found on his person.

(11) Juvenile hall intake assessment by Probation Officer Childers: On October 30, 2002, Saldana admitted being involved in the Norteño gang, but denied "claiming."

(12) Probation report by Probation Officer Garcia: On April 17, 2003, Saldana admitted associating with the Norteño gang.

(13) Notation by Officer Sharkie: On June 7, 2003, Sharkie conducted a probation search of Saldana's bedroom. She found and confiscated one red hat, one red sweatshirt, and one red Heat jersey.

(14) Turlock Police Department No. 03–8782: On September 2, 2003, an officer responded to Farr Street in Turlock in response to a report of a carjacking and kidnapping. The victim reported he had stopped at an intersection when a vehicle stopped in front of him and two individuals got out. One punched the victim and knocked him out. The victim identified Saldana and Fuentes as being with this person. The victim said he was pulled from his car, thrown into its backseat, and driven to another area. This occurred because the victim had been associating with Sureños and was believed to be giving them information. Fuentes and Saldana were arrested for carjacking and kidnapping for carjacking.

(15) Turlock Police Department No. 04–7738: On August 4, 2004, police officers conducted a probation search at Saldana's residence. They located several firearms, including a sawed-off shotgun and ammunition, another modified shotgun, an illegally modified .22–caliber rifle, a nine-millimeter revolver, and handgun ammunition. Saldana admitted the firearms and ammunition were his, and said he had them to protect his residence. His tattoos were documented as "W" on his left forearm and "S" on his right forearm, which Saldana stated stood for West Side. He had the word "Turlock" tattooed on his upper back, and said he used the moniker Tito.

(16) Modesto Police Department No. 05–40681: On April 15, 2005, a Norteño gang membership roster was found on a wila in a cell at the Stanislaus County Jail that housed Norteño gang members. Saldana's name was on the roster.

(17) DA Report No. 05–DA0234: On September 6, 2005, Mariscal interviewed the victim of the earlier carjacking. The victim related he had been walking down the street when he was jumped by two individuals he identified as Saldana's cousins. They called him a rat and beat him up because he was going to testify against Saldana in the carjacking case. The victim said he had been an active Norteño gang member with Saldana, and he identified Saldana as an active member.

(18) Modesto Police Department No. 07–73364: On August 3, 2007, Saldana was the passenger in a vehicle with the license plate "Turloco." Gutierrez and three others were also in the car. Saldana said "VWS" stood for "Varrio West Side," and he stated he was a "Norteño only."

(19) Turlock Police Department No. 07–11617: On November 27, 2007, officers conducted a parole search of Saldana's residence. In his bedroom closet, they found a loaded .38–caliber handgun. Saldana's girlfriend said the gun belonged to her, but gave conflicting statements. Saldana was arrested for being a felon in possession of a firearm. During subsequent telephone calls to his girlfriend from jail, Saldana said Gutierrez was going to take blame for the gun. When the girlfriend said she would take the blame because she had already told police the gun was hers, Saldana said he would not allow her to take the blame, and that Gutierrez would do it.

(20) The current offense. When Gutierrez's wife was interviewed, she identified both defendants as active gang members. On June 12, when booked into jail, Saldana admitted he affiliated with Norteños.

As described in the statement of facts, *ante*, Mariscal opined that, on the date Villanueva was shot, Saldana was a Norteño gang member. Mariscal based this opinion on all the reports and incidents he reviewed concerning Saldana.

### 2. *Applicable Legal Principles*

"The Confrontation Clause of the Sixth Amendment [to the United States Constitution] provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In [*Crawford, supra*,] 541 U.S. [at pages] 53–54, [the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding ... is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*). "Accordingly, after *Davis*, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial. If the statement is testimonial, it must be excluded unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant. If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 291; see *People v. Cage* (2007) 40 Cal.4th 965, 981–982 & fn. 10, 984.)

In *Crawford*, the United States Supreme Court declined to give a precise definition of "testimonial statements," although it gave as "formulations of [the] core class of 'testimonial' statements" "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,'

39

[citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]"; and "[s]tatements taken by police officers in the course of interrogations," with the term "interrogation" being used in its colloquial, rather than any technical legal, sense. (*Crawford, supra*, 541 U.S. at pp. 51–52, 53, fn. 4.) The court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id*. at p. 51.)

In *Davis*, the high court declined to attempt to classify all conceivable statements—even those made in response to questioning by police—as either testimonial or nontestimonial. (*Davis, supra*, 547 U.S. at p. 822.) It did further define the categories, however, stating: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid*., fn. omitted.)

From *Davis*, the California Supreme Court has derived several basic principles. "First, ..., the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra*, 40 Cal.4th at p. 984, fns. omitted.) "It is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause. [Citation.] Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission." (*People v. Blacksher* (2011) 52 Cal.4th 769, 813; see *Michigan v. Bryant* (2011) 562 U.S. —— [131 S.Ct. 1143, 1155].)

It is settled that, "because the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper. [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.) "'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably ... be relied upon" for that purpose. [Citations.]'" (*People v. Carpenter* (1997) 15 Cal.4th 312, 403, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107.) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter ...

upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 (Gardeley ).)

The application of *Crawford* to such "basis evidence" is less settled. Several appellate opinions have held *Crawford* does not apply, reasoning variously that hearsay in support of expert opinion is not the sort of testimonial hearsay the use of which *Crawford* condemned (*People v. Ramirez, supra*, 153 Cal.App.4th at p. 1427) or that hearsay relied on by experts in formulating their opinions is not testimonial because it is not offered for the truth of the fact stated (*People v. Cooper* (2007) 148 Cal.App.4th 731, 747; *People v. Thomas, supra*, 130 Cal.App.4th at p. 1210) and the expert is subject to cross-examination concerning his or her opinions (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 154). In *People v. Hill* (2011) 191 Cal.App.4th 1104, by contrast, the court determined that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id*. at p. 1131, fn. omitted.) Nevertheless, the court found itself bound by *Gardeley* and similar California Supreme Court precedent, and so concluded the trial court in the case before it properly determined the challenged basis evidence did not violate the hearsay rule or confrontation clause, since it was not offered for its truth but only to evaluate the expert's opinions. (*Hill, supra*, at p. 1131.)

The United States Supreme Court itself has produced fractured opinions concerning *Crawford's* application to expert testimony and the information on which such testimony is based. (See, e.g., *Williams v. Illinois* (2012) 567 U.S. —— [132 S.Ct. 2221]; *Bullcoming v. New Mexico* (2011) 564 U.S. —— [131 S.Ct. 2705]; *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305.) Thus far, the California Supreme Court has attempted to make sense out of these opinions in cases involving basis evidence such as autopsy and laboratory analysis reports. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 655–656, 658–659 (*Rutterschmidt*); *People v. Dungo* (2012) 55 Cal.4th 608, 612, 617–618; *People v. Lopez* (2012) 55 Cal.4th 569, 573, 579–582; see also *People v. Geier* (2007) 41 Cal.4th 555, 593–594, 596–607.) It has yet to do so, however, with respect to the basis evidence of a gang expert, whose testimony is usually based, at least in part, on his or her own experience and investigation.

Post-*Crawford*, reliability is not part of the confrontation clause inquiry. (*People v. Wilson* (2005) 36 Cal.4th 309, 343.) It remains relevant with respect to expert testimony, however: "[A]ny material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.] [¶] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 618.)

The California Supreme Court has cautioned that "prejudice may arise if, '"under the guise of reasons,"' the expert's detailed explanation "'[brings] before the jury incompetent hearsay evidence.'" [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 918–919.) "Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay,

41

disputes in this area must generally be left to the trial court's sound judgment. [Citations.]" (*Id*. at p. 919.)

"Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]" (*People v. Montiel, supra*, 5 Cal.4th at p. 919.) In addition, "[a] trial court ... 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness ... against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 619.) Evidence Code section 352 further "authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]" (*People v. Montiel, supra*, 5 Cal.4th at p. 919.)

   *3. Analysis*

As previously described, defendants challenge Mariscal's recitation of their prior bad acts on *Crawford*, reliability, and Evidence Code section 352 grounds. "'It is, of course, "the general rule"'—to which we find no exception here—"'that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' [Citations.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 186.) This rule applies to constitutional claims (*People v. Rudd* (1998) 63 Cal.App.4th 620, 628–629), unless "(1) it 'is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 353, italics omitted.)

The *Crawford* objection was clearly before the trial court. We will assume, for the sake of argument, that the isolated references by the court and counsel to reliability, prejudice, and probative value were sufficient to satisfy the requirement of a timely and specific objection with respect to those grounds. (Compare *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8 ['"bare reference'" to inability to cross-examine insufficient to preserve confrontation clause claim] with *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 343, fn. 5 [objection that "'the prejudice would outweigh the probative value'" sufficient to invoke Evid.Code, § 352].) The problem is, Gutierrez neither secured a ruling initially nor reiterated his objections when Mariscal testified before the jury. Saldana likewise did not secure a ruling initially; although he did request and obtain a continuing objection on confrontation clause grounds, he did not reiterate any of the other grounds for exclusion he now asserts.

"'[T]he absence of an adverse ruling precludes any appellate challenge.' [Citation.] In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point. That is the rule. No exception is available." (*People v. Rowland* (1992) 4 Cal.4th 238, 259.) A "properly directed" in limine motion may

preserve an objection for appeal, but again, "the proponent must secure an *express* ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171, italics added.)

"[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353,[N.26] i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

> [N.26] Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

In responding to the in limine motion, the trial court here made it clear it could not make a blanket ruling on defendants' *Crawford* claim, was making no ruling on whether the basis evidence met any other requirements for being placed before the jury, and would have to consider each type of evidence as it was presented. Subsequently, it also made clear that Saldana's continuing objection under Crawford did not encompass, or excuse Saldana from making, objections on other grounds.

Under these circumstances, we conclude defendants failed to preserve some, if not all, of the issues for appeal. "Because the trial court did not rule on [their] objections *in limine*, [they] '[were] obligated to press for such a ruling and to object to [the evidence] until [they] obtained one. [They] failed to do so, thus depriving the trial court of the opportunity to correct potential error.' [Citation.]" (*People v. Ramos, supra*, 15 Cal.4th at p. 1171.)

In any event, we disagree with defendants' assertion they were prejudiced by admission of the challenged evidence. [N.27] In this regard, defendants argue that gang evidence is "powerfully prejudicial." They say there was ample evidence, apart from their prior acts, upon which Mariscal could have opined they were gang members. Accordingly, they conclude, the prosecutor brought in those bad acts to show criminal disposition and bad character, as a means of creating an inference defendants were guilty as charged based on their longstanding gang involvement. Defendants say the evidence was "designed to inflame the passions and prejudices of the jury" against them.

> [N.27] Accordingly, we need not address Saldana's undeveloped assertion that if trial counsel forfeited the issue, Saldana received ineffective assistance of counsel. Saldana chides the Attorney General for merging two

issues contained in Saldana's opening brief. Saldana says this violates California Rules of Court, rule 8.204(a)(1)(B), which requires that a brief "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority...." Saldana says the Attorney General has "waived response to these arguments by failing to comply with the rules of court."

In our view, the Attorney General has fully complied with the rule. The true issue is whether the gang expert should have been permitted to testify to defendants' prior bad acts. That Saldana has chosen to place constitutional and state evidentiary grounds for his claim of error into separate issues does not mean the Attorney General was required to employ identical organization. On the other hand, we doubt Saldana's ineffective assistance of counsel claim complies with the same rule.

Generally speaking, "[t]he erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Error in the admission of nontestimonial hearsay is also assessed under the *Watson* standard (*People v. Davis* (2005) 36 Cal.4th 510, 538; *People v. Garcia, supra*, 168 Cal.App.4th at p. 292), as are error in the admission of prior crimes evidence (*People v. Williams* (2009) 170 Cal.App.4th 587, 612) and a trial court's determinations under Evidence Code section 352 (People v. Gonzales (2011) 51 Cal.4th 894, 924). *Crawford* error, on the other hand, is assessed under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (*People v. Archer* (2000) 82 Cal.App.4th 1380, 1394; see also *People v. Harrison* (2005) 35 Cal.4th 208, 239), as are due process violations (see *People v. Mena* (2012) 54 Cal.4th 146, 159; *People v. Malone* (1988) 47 Cal.3d 1, 22). "Harmless-error review looks ... to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

"Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' [citation], [has the United States Supreme Court] imposed a constraint tied to the Due Process Clause." (*Perry v. New Hampshire* (2012) 565 U.S. —— [132 S.Ct. 716, 723]; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 696–697 & cases cited.) "'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, italics added.)

"California courts have long recognized the potential prejudicial effect of gang evidence. However, they have admitted such evidence when the very reason for the crime, usually murder, is gang related. [Citations.] Evidence of gang membership has also been admitted to prove bias, provided it is not cumulative to other properly admitted and less inflammatory evidence. [Citations.]

"Due to its potential prejudicial impact on a jury, our Supreme Court has

44

condemned the introduction of 'evidence of gang membership if only tangentially relevant, given its highly inflammatory impact.' [Citation.] Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.] Such evidence is only admissible when it is logically relevant to some material issue at trial other than character trait evidence. [Citation.]" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)

In the present case, the evidence was logically relevant to material issues at trial other than character trait or disposition, including membership in the gang (which in turn was relevant to the gang enhancement allegations), the existence of a criminal street gang as defined in section 186.22, subdivision (f), and to corroborate information contained in the wilas (which in turn was relevant to identifying defendants as the authors thereof). [N.28] (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 820 [evidence regarding defendant's affiliation with gang, gang's prior criminal activities, and notes found in defendant's cell were relevant to gang enhancement allegation].) Although prosecutors may not "have any right to 'over-prove their case or put on all the evidence that they have'" (*People v. Williams, supra*, 170 Cal.App.4th at p. 610), neither will we require them to risk "under-proving" their case. Even assuming some of the prior bad acts may have been cumulative, some were not. "Such relevant and admissible evidence could properly have included even the most inflammatory incidents. [Citation.]" (*Id*. at p. 613.)

> [N.28] " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid.Code, § 210.)

As the evidence was relevant to prove "a fact of consequence," its admission did not violate due process. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Assuming some was testimonial, we likewise have no problem concluding any error was harmless beyond a reasonable doubt. Defendants testified and admitted being Norteños. Gutierrez admitted having been convicted in 1999 of felony assault, while Saldana admitted having been convicted of carjacking in 2006, at which time he was also charged with kidnapping. (See *People v. Allison* (1989) 48 Cal.3d 879, 889–890 [defendant not prejudiced by prosecutor's elicitation of testimony from witness that defendant was in county jail on unrelated charges at particular time, where defense counsel elicited same information in cross-examination of said witness and defendant revealed same information in own testimony].) The record does not support defendants' claim the evidence was offered in an attempt to show criminal disposition or inflame the jury (compare *People v. Memory* (2010) 182 Cal.App.4th 835, 858–859, 862–864), and we find no reasonable likelihood jurors' passions were inflamed (see *People v. Williams, supra*, 170 Cal.App.4th at p. 612). Counsel for Gutierrez elicited, in his cross-examination of Mariscal, that the prior incidents were merely contacts with law enforcement, and that if counsel yelled at a police officer out in the hall or something similar, that could be listed as a contact. Counsel further elicited that Gutierrez was not convicted for the prior acts except for the one in 1999. Counsel for Saldana elicited, in his cross-examination of Mariscal, that part of Mariscal's opinion was based on reports as opposed to his own personal knowledge, and that reliability was always an issue with respect to reports, in that Mariscal had to make a determination whether a report was to be believed.

1    Significantly, jurors were instructed not to disregard the testimony of any witness
2    (which here included defendants) "without a reason or because of prejudice or
     desire to favor one side or the other." They were told they had to decide whether
3    information on which an expert relied was "true and accurate." They were also
     told, however, that in reaching their conclusions as expert witnesses, Mariscal and
4    Teso "considered statements made by the defendants, other gang members, other
     gang experts, police officers, detectives, probation officers, and parole officers.
5    You may consider those statements only to evaluate the expert's opinion. *Do not
     consider those statements as proof that the information contained in the statements
6    is true*." (Italics added.) Finally, jurors were instructed:

7         "You may consider evidence of gang activity *only* for the limited purpose
          of deciding whether defendant acted within [sic] the intent, purpose, and
8         knowledge that are required to prove the gang-related crime and
          enhancement charge or the defendant had a motive to commit the crime
9         charged.

10        "You may also consider this evidence when you evaluate the credibility or
          believability of a witness. And when you consider the facts and
11        information relied on by an expert in reaching his or her opinion.

12        "*You may not consider this evidence for any other purpose.* [¶] ... [¶]

13        "*You may not conclude from this evidence that the defendant is a person of
          bad character or that he has a disposition to commit crime.*" (Italics
14        added.)

15   We presume jurors followed these instructions. (*People v. Yeoman* (2003) 31
     Cal.4th 93, 139; *People v. Williams, supra,* 170 Cal.App.4th at p. 613.) Taken
16   together with evidence of guilt that, in our view, was very strong, we conclude any
     error was harmless under any standard.

17   Gutierrez, 2013 WL 4523566, at *18–29.

18        b.   *Federal Standard*

19        The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

20   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him

21   . . . ." U.S. Const ., Amend. VI.  The Confrontation Clause bars "admission of testimonial

22   statements of a witness who did not appear at trial unless he was unavailable to testify, and the

23   defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S.

24   36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006).  The Confrontation Clause

25   applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541

26   U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24.  "'Testimony,' in turn, is typically a

27   solemn declaration or affirmation made for the purpose of establishing or proving some fact."

28   Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at

46

824. As the <u>Davis</u> court explained:

> [a] critical portion of [*Crawford's*] holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

*Davis*, 547 U.S. at 821 (citation omitted).  Thus, nontestimonial statements do not implicate the Confrontation Clause.  *Giles v. California*, 554 U.S. 353, 376 (2008).  Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  <u>Crawford</u>, 541 U.S. at 59 n. 9. Additionally, a Confrontation Clause violation is subject to harmless error analysis.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986).  A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

"Although <u>Crawford</u> did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'"  <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 927 (9th Cir.2008) (quoting <u>Crawford</u>, 541 U.S. at 51).  Subsequent Supreme Court cases have suggested that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events.  <u>See</u> <u>Williams v. Illinois</u>, 567 U.S. 50, __, 132 S.Ct. 2221, 2242 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); <u>Melendez–Diaz v. Massachusetts</u>, 557 U.S. 305 (2009) (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective witness reasonably to believe that the

1  statement would be available for use at a later trial") (internal citation and quotation marks

2  omitted).

3                   *c.  Analysis*

4        Here, the state court applied the correct legal standard under the Sixth Amendment by

5  applying Crawford, 541 U.S. 36.  Thus, the only question is whether the state court's adjudication

6  is objectively unreasonable.  The Court concludes that it is not.

7        First, the statements relied upon by the gang expert were not testimonial in nature.  The

8  gang expert in this case relied on police reports, offense reports, probation reports, and oral

9  statements from gang members concerning the activities and customs of the local Norteño gangs.

10  The Confrontation Clause applies only to "witnesses against the accused, i.e., those who bear

11  testimony," therefore, it could apply only to the oral statements relied upon by the expert.

12  Crawford, 541 U.S. at 51.  Here, the oral statements could not be considered testimonial in nature,

13  because they bore no resemblance to formalized statements such as affidavits, depositions, prior

14  testimony, or confessions.  Williams, 132 S.Ct. at 2242.  Thus, the statements relied upon by the

15  gang expert did not violate the Confrontation Clause.

16        In addition, even if considered testimonial in nature, the statements were not offered for

17  their truth but only to inform the gang expert's opinion.  For this reason as well, the gang expert's

18  opinion could not violate the Confrontation Clause.

19        Moreover, there is no clearly established Supreme Court precedent finding a violation of

20  the Confrontation Clause resulting from the admission of an expert's opinion based on hearsay

21  statements.  In Williams, a majority of the Supreme Court found that the laboratory results from a

22  nontestifying technician which informed the expert witness were not testimonial in nature and

23  therefore did not violate the Confrontation Clause.  Williams, 132 S.Ct. at 2240, 2242-43.  Also, a

24  plurality concluded that the laboratory results were admitted for the nonhearsay purpose of

25  "illuminating the expert's thought process" rather than establishing the truth of the matter

26  asserted.  Id. at 2240.  Because the Supreme Court has provided no clear answer to this question,

27  "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."

28  Wright v. Van Patten, 552 U.S. 120, 126 (2008).

1    Even if there was error, the state court reasonably concluded that the admission of the

2    gang expert's testimony did not have a "substantial and injurious effect or influence on the jury's

3    verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  As Respondent points out, there was

4    substantial evidence that the shooting was gang-related independent of the expert's testimony.

5    Petitioner and his co-defendant freely admitted to being Norteño gang members at trial.  (RT

6    1635, 1848, 1863.)  In addition, Petitioner and his co-defendant declared they were Norteños on

7    the "wilas" they wrote while in jail.  (RT 841-50, 1105-52.)  They affirmed their loyalty to the

8    gang, discussed gang issues, and admitted their prior crimes in the wilas.  (CT[3] 865-67.)  Finally,

9    as noted by the state court, the jury was expressly instructed to consider the evidence of incidents

10   of gang activity to evaluate the expert's opinion testimony, and not for their truth.  (CT 993, 998,

11   1004.)

12        Therefore, the petitioner is not entitled to habeas relief because the state court decision

13   was not contrary to or an unreasonable application of clearly established Supreme Court

14   precedent.  And even if error occurred, it could have had no effect on the jury's verdict.  The

15   claim should be denied.

16                    *d.  Due Process Claim*

17        Petitioner also alleges that the admission of the gang expert's testimony violated his due

18   process rights.  A federal court's inquiry is limited to whether the evidence ruling "resulted in a

19   decision that was contrary to, or involved an unreasonable application of, clearly established

20   Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

21   With respect to the admission of evidence, there is no Supreme Court precedent governing a

22   court's discretionary decision to admit evidence as a violation of due process.  In Holley v.

23   Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit stated:

24        The Supreme Court has made very few rulings regarding the admission of
         evidence as a violation of due process. Although the Court has been clear that a
25        writ should be issued when constitutional errors have rendered the trial
         fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
26        admission of irrelevant or overtly prejudicial evidence constitutes a due process
         violation sufficient to warrant issuance of the writ. Absent such "clearly

27

28   _____
     [3] "CT" refers to the Clerk's Transcript on Appeal.

                                            49

established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."   [Citation omitted.] Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed. Holley, 568 F.3d at 1101.  Therefore, Petitioner cannot demonstrate that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  The due process claim should also be denied.

### 4.  Claim Five – Redaction of Statements

Petitioner contends that the trial court erred by failing to redact highly prejudicial statements from the "wila" he had written in the Stanislaus County Jail.  He claims the admission of this evidence violated his due process rights.

### a.  State Court Decision

This claim was raised and rejected by the Fifth DCA as follows:

Defendants claim the trial court erred when it failed to redact those portions of the wilas attributed to them that were more prejudicial than probative. They say admission of the evidence violated their federal and state due process rights to a fair trial. We conclude any error was harmless.

### 1.  Background

The prosecutor moved, in limine, for admission of the wilas that are described in the statement of facts, *ante*. He asserted they were highly probative on the issues of premeditation, motive for Villanueva's removal from Norteño ranks, and defendants' knowledge of the criminal gang activity of the Norteño gang as required for proof of the gang enhancement allegation. Copies of the wilas were attached to the motion. [N.29]

[N.29] The prosecutor's in limine motion also addressed authentication. The trial court held an Evidence Code section 403 hearing on the issue. It determined there was sufficient proof of authenticity to allow the wilas to go before the jury, but permitted defendants to challenge authentication in front of the jury.

Gutierrez asserted that portions of the wilas were irrelevant, highly prejudicial, and inflammatory, and should be excluded under Evidence Code section 352. An attempt by counsel to reach an agreement on redactions was unsuccessful, and so the matter was left for the court's determination.

Saldana objected only to certain portions of his wila. He first objected to No. 6, in which Saldana related he had two strikes, one for carjacking and one for assault with a firearm. [N.30]  The prosecutor conceded Saldana only had one strike—for carjacking—and that the strike allegation had been bifurcated. He argued,

50

however, that the same information was going to come in through the gang expert's testimony concerning the primary activities of the gang, and also that, considered in conjunction with the answer in No. 15 about "Chubbs" (Anthony Fuentes), it was probative on the now-jury-issue of authentication. Gutierrez joined, noting No. 6 of his wila related that he had one strike. He argued the connotation of having a strike was particularly prejudicial, beyond even the criminal record itself. The trial court directed the prosecutor to redact references to strikes, but to leave the charges. As for the reference in Saldana's wila to assault with a firearm, the court declined to redact it, saying, "[I]f that is what he or somebody else puts, that's what stays in there," and if it was incorrect, the defense could address the discrepancy at trial.

> [N.30] The information contained in the wilas corresponded to the Norteño new arrival questionnaire and apparently was numbered accordingly. The questionnaire itself is not contained in the record.

Saldana next objected to No. 10, which set out the times and places he was incarcerated beginning in 2004, the charges he faced, the fact he was on parole at one point, and three people who were in custody with him at each location. He argued this portion of the wila was confusing and had no real probative value. The prosecutor responded that there would be expert testimony the people listed were Norteños. He sought admission of No. 10 in its entirety, to show an ongoing association of three or more members and to counter any suggestion Varrio West Side Turlock was merely a neighborhood or club. The prosecutor argued that the listing in the wila of individuals from other cliques was consistent with the gang expert's anticipated testimony, and went directly to one of the required elements of section 186.22. The prosecutor agreed the information was being offered for a limited purpose, and noted the jury instructions would directly address the limited use to which the gang expert's testimony could be put. The trial court ruled No. 10 would be allowed, subject to a limiting instruction.

Counsel for Saldana stated: "Then I would object to a copy of [exhibit] 56 being presented to the jury if—it sounds like it is all going to get in, then let's let it all in and give them the original and let them decide whether that was actually written by Mr. Saldana." He emphasized that he wanted the jury to have the original, not an enlarged copy. Asked by the court if he was withdrawing any objections, counsel stated: "Yes. But I want them to see the original." After a brief discussion about whether the enlargement could also be admitted, the court clarified, "[Saldana] is withdrawing any objection, so long as the original is introduced into evidence." Counsel for Saldana responded, "Yes."

The hearing then turned to Gutierrez's objections. He first objected to No. 6, which related that he had one strike for assault with a firearm in 1999. Gutierrez argued the whole area ought to be redacted, because typically a jury would not be told about someone's criminal background. The court ruled the word "strike" would be redacted, but the remainder would be admitted for a limited purpose.

Gutierrez next objected to No. 10, which related the same sort of information as was contained in No. 10 of Saldana's wila, and stated that at one point, Gutierrez was returned to county jail for "666/187" but charges were never filed. Counsel for Gutierrez argued that allowing the jury to hear about assaults with a firearm and attempted murder, for which charges were never filed, was "incredibly prejudicial" and would cause jurors to be biased against him because they would think somehow he got away with something. Counsel also argued this was in essence a coerced statement rather than an admission, since people were required to answer

these questions in order to survive in jail. The prosecutor responded that, as was the case with Saldana, No. 10 showed association with gang members from other groups and the requisite ongoing association of three or more people. The prosecutor also argued it would counter the anticipated defense argument, that "this is nothing but a bunch of boys who were foolish or knuckleheads...." The court found no evidence of coercion, and ruled No. 10 was admissible, subject to a limiting instruction.

Gutierrez next objected to No. 24, which read, "Yes, I will assist La Casa in a removal at any time." Defense counsel expressed concern the jury could take that to mean Gutierrez was prepared to kill someone. He also related that he "probably" did not intend to contest that Gutierrez was the source of at least some of the information in the wila, and so, since he was "not going to be aggressively or non-aggressively disputing a lot of things in front of this jury," did not believe the prosecutor had "all these big hurdles...." The trial court ruled No. 24 would be received, subject to a limiting instruction.

Gutierrez next objected to No. 25, which listed other charges pending against him. Defense counsel argued the fact someone might have charges pending was not relevant and was prejudicial overkill, and he expressed concern the jury would conclude Gutierrez was someone who did not observe the law. The prosecutor argued the information, when considered in conjunction with the chronology and charges listed in No. 10, was probative of authentication, and the fact Gutierrez said he was arrested for manufacturing went to the primary activities of the gang. The information coming from Gutierrez himself would add to the credibility of the gang expert's opinion testimony concerning the primary activities of the gang. The trial court ruled the evidence would be allowed, subject to a limiting instruction.

Gutierrez had no further objections. The trial court again confirmed that counsel for Saldana wanted the entire wila admitted as to his client.

The wilas were admitted into evidence during Mariscal's testimony. With respect to Gutierrez's wila, Mariscal testified in part that his investigation revealed other evidence showing Gutierrez had a conviction for assault with a firearm in 1999; one of the charges listed—possessing pills for sale—was consistent with one of the primary activities of the Norteño gang; and Gutierrez's pending charges included a moving violation, which involved Gutierrez being stopped approximately two weeks before the shooting in the white Altima that was burned in San Jose after the shooting.

Mariscal read No. 10 to the jury. He explained that the references to "3Ns" were consistent with someone reporting other active Norteños with whom he was housed, and that this played into the requirement of an ongoing association of three or more people. This was an example of a gang member associating with other Norteños. Mariscal testified No. 16 read, "I have no problems functioning with la casa's expectations," which told Mariscal that Gutierrez was fully willing to be an active participant in the Norteño organization in custody, and to follow their rules, policies, and expected behavior. With respect to No. 24, in which Gutierrez wrote he would assist La Casa in a removal at any time, Mariscal testified this indicated Gutierrez was willing to participate in a removal or assault upon someone if the gang determined a fellow gang member was to be removed or assaulted for any reason. Mariscal also read No. 15 to the jury, in which Gutierrez explained how Villanueva was threatening the lives of Gutierrez and his children, and about the altercation in which Saldana was assaulted.

Mariscal's testimony concerning Saldana's wila was similar with respect to the meaning and significance of various portions, and how the wila played into his opinions in this case. [N.31]  Mariscal read No. 15 to the jury; in it, Saldana stated that, although he was not aware if Villanueva was active or nonactive, on several occasions he promoted himself as a degenerate. Mariscal explained that a degenerate was the worse possible thing a gang member could be in the eyes of the gang. Saldana also wrote about how Villanueva and his companions threatened Saldana and his family, and about the altercation at the wedding reception. Saldana said they arrived in a car driven by Fuentes, also known as Chubbs, who "snitched" on Saldana for carjacking in 2004. Saldana wrote that people were saying "they" killed Villanueva because they had the most problems with him, and now people were threatening to kill their children and their mother.

> [N.31] At one point, counsel for Saldana objected that Mariscal was not reading the entire wila.

Gutierrez testified that he suffered a felony assault conviction in 1999. He admitted Northerners dealt drugs as one of their primary activities, and that, after the March 22 fight, he hung around with other gang members, dealing drugs. He testified Mariscal was correct when he said Norteños dealt drugs as one of their primary activities. He testified that although he did not know Bond No. 13, he answered yes to the question about it just to let "them" know he would assist in "whatever it was." He also testified that when he wrote he had no problem functioning with La Casa's expectations, he meant whatever was expected or asked by the Norteño gang. With respect to his answer about assisting in removal, he explained that to him, removal meant assaulting someone, possibly a fellow gang member. So far as he knew, there was no way a Norteño got removed other than being assaulted.

Saldana testified that he was convicted of carjacking in 2006. He was also facing a kidnapping charge with a potential life sentence, and so he accepted a deal in which the kidnapping charge was dropped and he received three years. Asked why, if he did not shoot Villanueva, he fled with his brother, Saldana brought up his parole status. Asked what he meant when he wrote, "It would be an honor to assist la casa in a removal," he responded he did not know. Asked if he would do anything the gang told him to do, he replied, "Yeah, pretty much."

The limiting instructions given to the jury with respect to the gang evidence are described ante. In addition, jurors were told they had heard evidence defendants made an oral or written statement before trial; jurors were to decide whether a defendant made any such statement in whole or in part; if they decided a defendant made such a statement, it was to be considered along with all the other evidence, and jurors were to decide how much importance to give it; and they could not convict a defendant of any crime based on his out-of-court statements alone.

2. *Analysis* [N.32]

> [N.32] The Attorney General says Saldana forfeited his claim of error when his trial counsel expressly withdrew his objections and request for redaction and asked that the wila attributed to Saldana be presented to the jury in its entirety. Generally speaking, a defendant who withdraws his or her objection to evidence cannot complain, on appeal, of its admission. (*People v. Jones* (2003) 29 Cal.4th 1229, 1255; *People v. Robertson* (1989) 48 Cal.3d 18, 44.) Under the circumstances here, however, "[w]e will assume ... that [Saldana's] decision to do so was an instance of a party

making the best of an allegedly erroneous ruling, and therefore does not bar his claim on appeal. [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

The Attorney General also contends Gutierrez's claim has been forfeited, because Gutierrez has simply joined in Saldana's contention on appeal without supplying argument on the issue as it applies to Gutierrez himself. The Attorney General says Gutierrez's claim involves different evidence and a different defendant than Saldana's claim; hence, the prejudice analysis must be different. In light of the similarity between the wilas and the overall trial evidence as it pertains to both defendants—as demonstrated by the Attorney General's own argument on the merits of admission of the wilas—we decline to find forfeiture on Gutierrez's part.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Under this statute,

"[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. [Citations.] ""Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.... [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490–491; see *People v. Holford* (2012) 203 Cal.App.4th 155, 167.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.) The trial court need not expressly weigh prejudice against probative value, or state it has done so. (*People v. Waidla, supra*, 22 Cal.4th at p. 724, fn. 6.)

We find no abuse of discretion in the present case. Some of the information recited

in the wilas about defendants' criminal activity came before the jury through their own testimony, and so was probative on the question of the wilas' authenticity, a disputed question upon which the jury had to make the final determination. It can hardly have come as a surprise to jurors that defendants had been in custody and faced charges beyond those for which they were on trial; in addition to admitting he had a prior felony conviction for assault, Gutierrez testified he had been in a lot of fights, mostly because of the people with whom he associated, said he planned to sell marijuana on the day of the shooting, and admitted intentionally burning a vehicle; while Saldana admitted his prior conviction for carjacking also originally involved a kidnapping charge, and that he was on parole at the time of the shooting.

Many of the past or pending charges recited in the wilas were probative of Mariscal's opinions concerning the Norteños' primary activities and pattern of criminal gang activity, and the prosecutor questioned Mariscal about them in that context. Defendants point to the fact there was testimony Stanislaus County contained 3,000 to 4,000 documented Norteños, but the prosecutor was still required to prove every element of the section 186.22, subdivision (b) enhancement, including the existence of a criminal street gang as defined in subdivision (f) of section 186.22. Thus, he had to prove not only an ongoing association of three or more persons, but also the primary activity or activities of that group, and that the group's members engaged in a pattern of criminal gang activity as defined in subdivision (e) of the statute. (See *People v. Coddington* (2000) 23 Cal.4th 529, 597, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) The prosecutor was not obliged to prove those elements through other evidence simply because he might have had the means to do so. (See *People v. Watson* (2008) 43 Cal.4th 652, 684.) The information in the wilas concerning other Norteños with whom defendants had been incarcerated was also probative; it demonstrated that the various cliques— including Varrio West Side Turlock—were not simply neighborhood groups, but were under the larger Norteño criminal street gang umbrella. (See *People v. Williams* (2008) 167 Cal.App.4th 983, 987–988.)

Under the circumstances, most, if not all, of the challenged evidence was highly probative of issues actually in dispute, and was not substantially outweighed by the risk of undue prejudice, especially in light of the limiting instructions given by the trial court. (See *People v. Fuiava, supra*, 53 Cal.4th at pp. 669–670; *People v. Richardson* (2008) 43 Cal.4th 959, 1004.) Accordingly, defendants have failed to establish the trial court abused its discretion in admitting the bulk of the wilas' contents. (See People v. Branch (2001) 91 Cal.App.4th 274, 286–287.)

To the extent there was error (for example, in the admission of Saldana's inaccurate representation that he had a prior conviction for assault with a firearm; Gutierrez's apparent arrest, without charges ever being filed, for attempted murder; and both defendants' professed willingness to assist in a removal), we have examined the record and conclude there is no reasonable probability the jury would have reached a different result had the evidence been excluded. (*People v. Whitson* (1998) 17 Cal.4th 229, 251; *Watson, supra*, 46 Cal.2d at p. 836.) Defendants claim the error rendered their trial fundamentally unfair, so that we must assess prejudice under the more rigorous *Chapman* standard. (See *People v. Williams, supra*, 170 Cal.App.4th at p. 612.) In light of the properly admitted evidence and the trial court's limiting instructions, however, we conclude defendants have failed to satisfy the required "high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial." (*People v. Albarran, supra*, 149 Cal.App.4th at p. 229; see *People v. Richardson, supra*, 43

1

2

3

Cal.4th at p. 1004; *People v. Champion* (1995) 9 Cal.4th 879, 925, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860.) This case simply does not present "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran, supra*, 149 Cal.App.4th at p. 232.)

4

Gutierrez, 2013 WL 4523566, at *29–34.

5

### b.  Federal Standard

6

As previously stated, a federal court in a habeas proceeding does not review questions of

7

state evidence law.  The Court's inquiry is limited to whether the evidence ruling "resulted in a

8

decision that was contrary to, or involved an unreasonable application of, clearly established

9

Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

10

As to the admission of overtly prejudicial evidence, there is no Supreme Court precedent

11

governing a court's discretionary decision to admit evidence as a violation of due process.  See

12

supra, Holley, 568 F.3d at 1101.  Since there is no clearly established Supreme Court precedent

13

governing a trial court's discretionary decision to admit evidence as a violation of due process,

14

habeas relief is foreclosed.  Id.  Therefore, Petitioner cannot demonstrate that the state court

15

decision was contrary to, or involved an unreasonable application of, clearly established federal

16

law, and the claim should be denied.

17

Even if habeas review were available, it is clear that the admission of the contested

18

evidence did not prevent a fair trial.  As noted by Respondent, Petitioner did not allege that the

19

entire wila was inadmissible. Rather, he claimed that three responses should have been redacted.

20

But it is clear that those three statements were highly relevant to prove the allegation that the

21

murder had been committed for the benefit of, at the direction of, or in association with, a

22

criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by

23

gang members.  See Cal. Penal Code § 186.22.

24

First, Petitioner's pending charges were relevant to inform the gang expert's opinion that

25

the Norteño gang engaged in a pattern of criminal gang activity, and Petitioner was an active gang

26

member.  Second, his identification of other Norteño gang members he was housed with during

27

his incarcerations was relevant to inform the gang expert's opinion that there was an ongoing

28

association of three or more people and that Petitioner associated with the Norteños.  Finally,

56

Petitioner's statement that "[i]t would be an honor to assist la casa in a removal" was relevant to inform the gang expert's opinion that Petitioner was an active Norteño gang member who was committed to the gang's activities.  Because the prosecution bore the burden of proving all elements of the offense, this evidence was admissible and highly relevant to the prosecution's case.

In any case, Petitioner has failed to demonstrate that the state court finding that any error was harmless was unreasonable.  He fails to show that the state court's decision was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.  Petitioner readily admitted to being a member of the Norteño gang, and he admitted that he wrote the wila.  (RT 1848, 1855.)  He testified about his prior conviction for carjacking and that he pleaded guilty to get a kidnapping charge dropped.  (RT 1821.)  He further testified that he was on parole at the time of the shooting.  (RT 1843.)  Finally, when asked if he would do anything the gang tells him to do, he testified, "Yeah, pretty much."  (RT 1862-63.)  Therefore, any prejudice resulting from inferences drawn from the statements in the wila would have resulted from his own testimony as well.  In addition, the jury was given cautionary instructions concerning his out-of-court statements.  (CT 1002; RT 1003.)  Accordingly, Petitioner's claim that the admission of evidence violated his due process rights should be denied.

### 5.  Claim Six – Prosecutorial Misconduct

Petitioner alleges the prosecutor committed misconduct by telling the jury in closing argument to "send a message to the Norteño street gang."  See Pet. at 24.  Petitioner's counsel moved for a mistrial.  The trial court denied a mistrial but did admonish the jury.  Petitioner contends the admonishment was insufficient to cure the harm, and the prosecutor's misconduct violated his right to a fair trial.

#### a.  State Court Decision

Petitioner presented this claim on direct review to the Fifth DCA, where it was rejected in the last reasoned state court decision, as follows:

Defendants   contend   they   are   entitled   to   a   new   trial   due   to   prosecutorial

misconduct. They say the prosecutor's remarks undermined their due process rights to a fundamentally fair trial, an admonition was not sufficient to cure the prejudice, and the trial court erred by refusing to grant a mistrial upon defense request. We conclude defendants received the relief they requested, and the trial court's admonition adequately addressed any impropriety.

*A. Background*

At the conclusion of his opening summation, the prosecutor stated:

> "Everything you heard in testimony, everything I've been saying in this closing, the gang benefit, once again, with the clearance of Tito and Ramo in jail, what does that send, what message does that send to every other gang member out there who may dare to go to the aid of a degenerate.... What message is sent when a blatant, brazen, violent execution in broad daylight occurs, and the gang members are cleared?

> "This is the fear and intimidation I talked about, the hallmarks of the Norteño gang, what the Norteño gang needs in order to function the way they do, carrying out their primary activities on the citizens of Stanislaus County. That's one benefit. Second benefit, what does that do to the individual status of the two assailants?

> "You know, are Tito and Ramo fledgling gang members? Are they wannabes? After committing this type of crime, justifying it the way they did, they are gang superstars at this point. Other gang members are going to see this. The Norteño gang, once again, is proven as a violent, predatory criminal street gang. *And now it is time for you all to send a message to the gang. You won't tolerate it.*

> "This is not just another dead gang member. It's not a little trophy for the community. A gang member is dead. *This is a human being and a message that must be sent to the Norteños through you 12.* You heard the evidence. You gave them their day in court, and you convicted them of the righteous charge of premeditated, first-degree murder with the two enhancements. Thank you very much." (Italics added.)

Counsel for Gutierrez then began his summation. After the lunch recess, the following took place outside the jury's presence:

> "[COUNSEL FOR GUTIERREZ]: Yes, your Honor. I reflected over lunch, I didn't want to draw any more attention to it, but ... I'd ask the Court to consider, either now or ongoing, a defense motion for a mistrial *and/or* a possible admonition to the jury about that this is really not a referendum.

> That's not [the prosecutor's] words, but I think what was objectionable was his last comment, and I don't want to waive the objection about they need to send a message, and I think take a stand, you know, against gangsters. And I think that that's impermissible argument, and it's designed to incite and inflame the jury and have them forget their purpose and role in these proceedings. [¶] ... [¶]

> "[COUNSEL FOR SALDANA]: I thought the same thing. The verdicts should be based on the evidence and should not be based on some kind of moral stance or some view that they have to take a stand against gang

members in general. I don't think that is their argument, so I would join in that motion. [¶] ... [¶]

"[PROSECUTOR]: Absolutely permissible argument, your Honor. And any type of admonition against the prosecution will stamp approval on the defense argument to the detriment of the prosecution....

"[COUNSEL FOR SALDANA]: The problem with [the prosecutor] is he got a little personal. You, Members of the Jury, you got to send a message to your fellow citizens, and that is crossing over the line.

"THE COURT: Here's my position. I agree with defense. I don't think that's appropriate argument, however, there was not a timely objection made; therefore, the motion is denied. [N.46] [¶] ... [¶] ... I've made my ruling, and I will advise [the prosecutor] not to make that type of argument in his rebuttal. [¶] ... [¶]

[N.46] The court had warned counsel at the beginning of trial that it expected objections to be timely made.

"[COUNSEL FOR GUTIERREZ]: ... [T]here's kind of an admonishment that the Court is supposed to essentially yell at the prosecutor. It's not something that has to happen right now—[¶] ... [¶]

"THE COURT: Here's what the book indicates, and when I say the book, I'm talking about California Criminal Law of Procedure and Practice 2010 edition, Section 30.27, 'Counsel should be specific in objecting to misconduct at any stage of the trial, especially during closing argument. Conduct may be found improper by the Court on appeal, but the error may be held to have been waived by the failure to object or by an ambiguous objection on the ground that the effect of the misconduct could have been cured by timely admonition.'

"[COUNSEL FOR GUTIERREZ]: *I'm asking for an admonition, your Honor.*

"THE COURT: You're asking me to bring emphasis to that statement now?

"[COUNSEL FOR SALDANA]: *Now, yes, I am.* [¶] ... [¶]

"[COUNSEL FOR GUTIERREZ]: If the Court would consider it, that's all, you know, it doesn't have to be right now at this point, but I do want to raise the issues, and I think it's still timely.

"THE COURT: Well, *let me ask defense counsel, if I were to give them an admonition, what would you want me to say to them?*

"[COUNSEL FOR GUTIERREZ]: It is improper to suggest that your role in these proceedings as the trier of fact is to, quote, send a message to anybody or on any issue.
"[COUNSEL FOR SALDANA]: Yeah, and that they should base their decision on the evidence and nothing more.

"[COUNSEL FOR GUTIERREZ]: The evidence and the Court's instructions but not for any other purpose.

"THE COURT: Can you find in the transcript that part where [the prosecutor] was telling them they need to send a message?

"(Whereupon, the requested portion was read back.) [¶] ... [¶]

"[COUNSEL FOR GUTIERREZ]: Well, then, that's it, your Honor, this sending a message.

"[COUNSEL FOR SALDANA]: I remember. As I recall you sent a message. The jury sent a message. That's what I found objectionable.

"THE COURT: Here's what I'm going to do. When they come back in, I'm going to tell them that [the prosecutor] made an argument that the Court considers improper and that part of the argument was that the jury is to send a message, and that their job is not to send messages. Their job is decide what the facts are and to follow the law and come to a just and final conclusion.

"[COUNSEL FOR GUTIERREZ]: *That's fine.*

"[COUNSEL FOR SALDANA]: *Sounds very good to me.* [¶] ... [¶]

"THE COURT: All right. All the ladies and gentlemen of the jury are back.

"Ladies and Gentlemen, there's a matter I want to address the jury about. [The prosecutor] made some comments during this final argument this morning that the Court considers to have been improper. When he asked you to send a message to the community, or words to that effect, and any similar type of argument, that was an improper argument, and I'm admonishing you to disregard it. It's not your job to send a message to anybody. It's your job to decide what the facts are, apply the facts of [sic ] the law and reach a fair and just verdict. Okay?" (Italics added.)

*B. Analysis*

"Prosecutorial misconduct may constitute an appropriate basis for a mistrial motion. [Citation.]" (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1154.) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854; accord, *People v. Bolden* (2002) 29 Cal.4th 515, 555.)

Settled standards govern review of misconduct claims. "'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" (*Ibid.*)

60

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) "When a claim of misconduct is based on the prosecutor's comments before the jury, ... '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citations.]" (*People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 305.) In making this determination, "we must view the statements in the context of the argument as a whole. [Citation.]" (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) A showing the prosecutor acted in bad faith is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

It is improper for a prosecutor to appeal to the passions or prejudice of the jury at the guilt phase of a criminal trial. (*People v. Cornwell* (2005) 37 Cal.4th 50, 92, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250; *People v. Fields* (1983) 35 Cal.3d 329, 362.) "[T]emperate speech[es] concerning the function of the jury and of the rule of law" have been found to be proper (*People v. Cornwell, supra*, 37 Cal.4th at pp. 92–93), as have "references to the idea of restoring law and order to the community" where such comments "were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury" against the accused (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 511–512, 513). [N.47]  On the other hand, misconduct has been found where the prosecutor asked jurors to base their verdict on considerations outside the merits of the case, such as public opinion and the reactions of those closest to them. (*People v. Morales* (1992) 5 Cal.App.4th 917, 928.)

> [N.47] Isolated references to retribution or community vengeance, or arguing the jury should send a message or make a statement by returning a verdict of death, have been held not to constitute misconduct when made in the penalty phase of trial, so long as such arguments do not form the principal basis for advocating imposition of the death penalty. (*See, e.g.*, *People v. Brady* (2010) 50 Cal.4th 547, 586; *People v. Martinez* (2010) 47 Cal.4th 911, 965–966; *People v. Wash, supra*, 6 Cal.4th at pp. 261–262.)

We need not decide whether the prosecutor's "send a message" remarks crossed the line into impropriety: The trial court told jurors the argument was improper and explicitly "admonished the jury to disregard the comments; it is assumed the jury followed the admonishment and that prejudice was therefore avoided. [Citation.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 701.) "A jury will generally be presumed to have followed an admonition to disregard improper evidence or comments, as '[i]t is only in the exceptional case that "the improper subject matter is of such a character that its effect ... cannot be removed by the court's admonitions." [Citation.]' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 692.)

Defendants fail to persuade us this is such an exceptional case. Contrary to defendants' assertion that they did not receive the relief they requested because they asked for a mistrial and the trial court refused to grant one, the record shows they requested a mistrial and/or an admonition, and they agreed to the trial court's admonition as an alternative to their untimely mistrial request. (See *People v. Thompson, supra*, 49 Cal.4th at p. 130.) They expressly agreed to the trial court's proposed admonition—which it ultimately gave—and did not claim it was inadequate or seek any additional charge to the jury. (See *People v. Chatman* (2006) 38 Cal.4th 344, 385.)

61

1

2

Presuming, as we do, that the jury understood and obeyed the trial court's instruction to disregard the prosecutor's "send a message" remarks, we conclude the trial court did not err. Any prejudice was cured by its admonition. (See *People v. Tully* (2012) 54 Cal.4th 952, 1020.) The prosecutor's "isolated, brief remark, when viewed in the context of the entire argument, ... could not have inflamed the jury's passions to the point where the outcome of the trial was affected or the trial became fundamentally unfair." (*People v. Rundle* (2008) 43 Cal.4th 76, 162, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) This is simply not a case in which "improper comments and assertions [were] interspersed throughout trial and/or closing argument" (*People v. Pitts, supra*, 223 Cal.App.3d at p. 692), or where "the sheer number of instances of prosecutorial misconduct and other legal errors raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone" (*People v. Hill, supra*, 17 Cal.4th at p. 845).

3

4

5

6

7

8

9
Gutierrez, 2013 WL 4523566, at *44–47.

10
> *b.  Federal Standard*

11
A habeas petition will be granted for prosecutorial misconduct only when the misconduct

12
"so infected the trial with unfairness as to make the resulting conviction a denial of due process."

13
Darden v. Wainwright, 477 U.S. 168, 171 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.

14
637, 643 (1974)).  It "is not enough that the prosecutor's remarks were undesirable or even

15
universally condemned."  Id.  To constitute a due process violation, the prosecutorial misconduct

16
must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

17
Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667

18
(1985)).  Under this standard, a petitioner must show that there is a reasonable probability that the

19
error complained of affected the outcome of the trial, i.e., that absent the alleged impropriety, the

20
verdict probably would have been different.

21
> *c.  Analysis*

22
Regardless of whether the prosecutor's remarks were improper, Petitioner's claim is

23
without merit.  The trial court admonished the jury that the statements made by the prosecutor

24
were improper, and directed the jury to disregard them.  When a curative instruction is given, it is

25
presumed that the jury follows it and that no due process violation occurred.  Greer, 483 U.S. at

26
766.  No reason or evidence has been offered to show that the jury was not able to follow the

27
instruction in this instance.  Moreover, counsel for the defendants agreed that the admonishment

28
was sufficient to avoid prejudice to the defendants.  In addition, there was no pattern of

continuing misconduct.  The comments were an isolated instance that was immediately thereafter addressed by the trial court, and the comments were stricken.  The jury was instructed not to consider counsels' arguments as evidence.  (CT 981.)  Finally, as Respondent points out, defense counsel responded to the prosecutor's argument in his own closing, thereby diluting any prejudicial effect.  (RT 1944.)  See Darden, 477 U.S. at 182.

In sum, Petitioner fails to show that the state court determination that any error was harmless was contrary to, or an unreasonable application of, Supreme Court authority.  The claim should be denied.

### 6.   Claim Seven – Prejudicial Court Security Measures

Petitioner contends the court-imposed security measures violated his due process right to a fair trial.  Specifically, he claims the appearance of two to three bailiffs in the courtroom created adverse conditions without justification.

#### a.   State Court Decision

Petitioner presented this claim on direct review to the Fifth DCA, where it was denied as follows:

> Saldana says he was denied a fair trial when the trial court imposed allegedly unsupported security measures on him while he testified. We agree with the Attorney General that there was no abuse of discretion and, in any event, Saldana cannot show prejudice.

> A.  Background

> At the outset of trial, security apparently consisted of having two bailiffs in the courtroom. Late in the prosecution's case-in-chief, the trial court was informed Gutierrez's cell had been searched and a potential weapon found. The court proposed to impose additional security measures "incrementally," by allowing defendants to remain unshackled in the courtroom, but requiring them to be separated by a chair's width or more and to keep their hands visible at all times while in court. It was the court's intent that if they put their hands into their pockets for any reason, the jury would be recessed and defendants would be placed in shackles. After discussion, the court adopted these measures, finding them the "most-minimum thing this Court should be doing at this point."

> Prior to Gutierrez testifying, the trial court noted its inclination to have a bailiff sit near Gutierrez during that testimony. Counsel for Gutierrez objected. He conceded that, since the earlier incident, a small razor had been found in the cell Gutierrez shared with another inmate, but represented Gutierrez simply used it to shave around the sides of his head. Counsel argued "it inherently would be viewed as prejudicial to have somebody up there by him." He further suggested that if a bailiff were placed by Gutierrez when Gutierrez testified, the court would be obliged to do the same if Saldana took the stand. When the court agreed, counsel for Saldana stated he would be opposed. The court suggested Gutierrez could be

allowed to testify without a bailiff present, with the understanding he was required to keep his hands on the witness box, fully visible at all times, and if he pulled his hands down, the bailiff would "go[ ] up." Counsel for Gutierrez agreed to that procedure. Counsel for Saldana requested that the issue be revisited, with respect to his client, after everyone saw how things went during Gutierrez's testimony. The court agreed. With respect to Gutierrez, the court ordered that there would not be a bailiff immediately next to him as long as he kept his hands on the witness box, fully visible, at all times; if he moved either hand off the wood of the witness box, security would be put in place; and if he was called upon by counsel to stand for demonstration purposes, counsel was to notify the court before asking such questions, whereupon a bailiff would come up and be in Gutierrez's immediate presence.

Gutierrez's testimony proceeded in accord with the court's order. [N.40] The record shows he was allowed to stand up and demonstrate the position he was in when, according to his testimony, Villanueva kicked him, and also what happened with the gun at that time.

> [N.40] Apparently, there were now three bailiffs in the courtroom, the third being added during Gutierrez's testimony (and apparently also being present for Saldana's testimony) because of the objection to having security immediately behind Gutierrez when he testified. Insofar as the record shows, one bailiff was at the back by the entryway, one was standing by the rail, and one was next to where defendants were seated.

Counsel for Saldana subsequently advised the court that he intended to call Saldana to testify, but he wanted him to be able to do so without having to be constantly conscious of keeping his hands in a certain position. Counsel did not believe that was "conducive to giving well-considered answers to the questions," and argued there had to be some showing Saldana himself posed some kind of threat. The court ruled that if Saldana wished to testify, he was to keep his hands visible at all times. If he failed to do so, a bailiff would be placed next to him during his testimony. The court stated it was "taking minimal-security precautions in light of the nature of this case and the information ... received about the defendant, Gutierrez, in particular."

Saldana's testimony proceeded in accord with the court's order. The record shows he gestured with his hand or hands during at least one portion of his testimony.

*B. Analysis*

"Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion. [Citations.]" (*People v. Hernandez* (2011) 51 Cal.4th 733, 741; accord, *People v. Duran* (1976) 16 Cal.3d 282, 293, fn. 12.) The level of findings required by the trial court depends on the nature of the security measure involved.

"Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest

need. [Citations.]" (*People v. Hernandez, supra*, 51 Cal.4th at pp. 741–742; see, e.g., *Deck v. Missouri* (2005) 544 U.S. 622, 629; *People v. Duran, supra*, 16 Cal.3d at pp. 290–291.) So too must a security device such as a stun belt, which, although not visible to the jury, may have a debilitating psychological effect on a testifying defendant. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219–1220, 1226–1227.)

By contrast, "[u]nless armed guards are present in an unreasonable number," their presence in the courtroom need not be justified by the trial court. (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1003.) Even stationing a bailiff near the witness stand while a defendant testifies is not inherently prejudicial; "evaluat[ing] the likely effects of the procedure 'based on reason, principle, and common human experience' [citation]," no "'"unacceptable risk is presented of impermissible factors coming into play."'" [Citation.]" (*People v. Stevens* (2009) 47 Cal.4th 625, 638.) Because such a practice is not inherently prejudicial, "it need not be justified by a compelling case-specific showing of need. [Citations.]" (Id. at p. 637.)

Even where a security procedure is not inherently prejudicial, a trial court must exercise its own discretion, rather than deferring to a generic policy or abdicating decisionmaking to law enforcement officers, in determining whether a particular security measure is appropriate on a case-by-case basis. (*People v. Hernandez, supra*, 51 Cal.4th at p. 742.) Similarly, although the prosecutor "may bring to the court's attention matters which bear on the issue," the prosecutor "plays no necessary part" in the trial court's determination whether security measures should be imposed and, if so, of what nature and to what degree. (*People v. Duran, supra*, 16 Cal.3d at p. 293, fn. 12.)

An order to a testifying defendant to keep his or her hands visible at all times is clearly not inherently prejudicial, especially where, as here, the defendant is permitted to gesticulate while testifying and the only threatened consequence for disobedience is to have a bailiff placed near the witness box—itself not an inherently prejudicial measure. The record amply demonstrates that before making any orders, the trial court here undertook "a thoughtful, case-specific consideration of the need for heightened security, [and] of the potential prejudice that might result." (*People v. Hernandez, supra*, 51 Cal.4th at p. 743.) It did not abuse its discretion in imposing what it accurately termed "minimal" security precautions.

Saldana complains, however, that the court made no findings specifically with respect to *him* and the potential threat *he* posed, as opposed to making findings based on Gutierrez's alleged misconduct. Recent California Supreme Court cases speak in terms of *case*-specific or *case-by-case* determinations, and not in terms of *defendant*-specific ones. (See *People v. Hernandez, supra*, 51 Cal.4th at p. 743; *People v. Stevens, supra*, 47 Cal.4th at pp. 642–643.) We are not aware of any authority precluding a court from taking into account one defendant's conduct in determining whether to impose security measures on a codefendant, especially where the codefendants are relatives and fellow gang members who are charged with premeditated murder, where the alleged misconduct by one of them involves possession of potential weapons, and where the security measures imposed are minimal and not inherently prejudicial. (See *People v. Ainsworth, supra*, 45 Cal.3d at p. 1004 [assessing reasonableness of security measures in light of nature of charges].)

Assuming the trial court erred, however, in not making particularized findings as to Saldana, because the measure imposed was not inherently prejudicial, any error is one of state law only and so is assessed under the *Watson* standard. (*People v.*

*Hernandez, supra*, 51 Cal.4th at pp. 745–746.) [N.41] The record shows no prejudice. Although defense counsel argued potential adverse effects on Saldana's testimony before Saldana actually took the witness stand, there is no suggestion they came to fruition during the testimony. Saldana clearly was not deterred from testifying (and had the benefit of seeing how the "hands visible" order would work during Gutierrez's testimony), and the record contains no hint the order affected the quality or content of his testimony, his ability to concentrate on the questions and give well-thought-out answers, his demeanor, or his ability to communicate with counsel or participate in his defense. (Compare *People v. Ervine* (2009) 47 Cal.4th 745, 773–774 with *People v. Mar, supra*, 28 Cal.4th at pp. 1224–1225; *People v. Miller* (2009) 175 Cal.App.4th 1109, 1115–1117; *People v. McDaniel* (2008) 159 Cal.App.4th 736, 745–746.) Under the circumstances, "the procedures implemented could not have influenced ... the ... verdict. '[A]ny error was clearly harmless.' [Citations.]" (*People v. Cox* (1991) 53 Cal.3d 618, 652–653, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

> [N.41] Saldana argues the *Chapman* standard applicable to federal constitutional error should apply. We are, of course, bound to follow our state high court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In any event, our analysis and conclusion would be the same under *Chapman*.

Gutierrez, 2013 WL 4523566, at *37–39.

### b.  Federal Standard

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that restraints are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005).  When reviewing a constitutional challenge to security measures taken in a state court criminal trial, "[a]ll a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Holbrook v. Flynn, 475 U.S. 560, 572 (1986).  In addition, while visible physical restraints and prison clothes may indicate a defendant is culpable or particularly dangerous,

> the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama

than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

Id. at 569.

### c. Analysis

Here, there is no indication that the security measures taken by the trial court were in any way prejudicial to Petitioner.  No visible restraints were utilized, and in fact Petitioner had free use of his hands and had no issue gesticulating during trial.  The fact that three security officers were present in court is unremarkable.  In addition, the trial court had ample justification for extra security measures because a potential weapon was found in Petitioner's co-defendant's cell. Even though the weapon was not found in Petitioner's cell, they were relatives and fellow gang members and were charged with premeditated murder.  The state court could reasonably determine that extra security measures were warranted as to both defendants.  Accordingly, Petitioner has not shown that the state court decision finding no prejudice was objectively unreasonable, and the claim should be rejected.

### 7.    Claim Eight – Gang Allegation

In his next claim, Petitioner alleges that the evidence was insufficient to support the finding that the offense of murder was committed for the benefit of, at the direction of, or in association with, a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members.  See Cal. Penal Code § 186.22(b)(1).

### a. State Court Decision

This claim was also raised on direct review to the Fifth DCA where it was rejected as follows:

Defendants contend the evidence is insufficient to sustain the jury's true finding on the section 186.22, subdivision (b) enhancement. We disagree.

To establish the gang enhancement under section 186.22, subdivision (b), "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, [and that it was committed] with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citations.]" (Gardeley, supra, 14 Cal.4th at pp. 616–617.) [N.33] Defendants say the evidence

fails to prove the shooting was to benefit the gang or that it was done with the requisite specific intent.

> [N.33] The prosecution must also prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting, two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citations.]" (*Gardeley, supra*, 14 Cal.4th at p. 617, italics omitted.) Defendants do not claim these elements were insufficiently established.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.) "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable to both convictions and gang enhancements (*People v. Leon* (2008) 161 Cal.App.4th 149, 161), and regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125).

"[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment ... only if the crime is "gang related."'" [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "The crucial element ... requires that the crime be committed (1) for the benefit of, (2) at the direction of, or (3) in association with a gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) [N.34]

> [N.34] The verdicts in this case accurately stated the requirement in the disjunctive. Neither the jury nor we need find evidence showing the crime was committed for the benefit of or at the direction of the Norteño gang, if there is substantial evidence the crime was committed in association with a gang.

In this case, the People presented evidence defendants, who were fellow gang members, committed the crime in association with each other. (See *People v. Leon, supra*, 161 Cal.App.4th at p. 163.) "Not every crime committed by gang members is related to a gang." (*Albillar, supra*, 51 Cal.4th at p. 60.) "Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang." (*People v. Morales, supra*, 112 Cal.App.4th at p. 1198.) From the information contained in the wilas, together

with the testimony of the gang experts, however, the jury here reasonably could have concluded the shooting was gang related, and that defendants "relied on their common gang membership and the apparatus of the gang"—particularly the assumption none of the witnesses would interfere with defendants' actions or later talk to police—in committing the crime. (*Albillar, supra,* 51 Cal.4th at pp. 60, 61–62.) That defendants are brothers "does not cancel out that [joint gang] membership." (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332.)

We recognize that it has been said an expert's testimony alone is not sufficient to find that an offense is gang related. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931.) Nevertheless, such testimony constitutes circumstantial evidence jurors may take into consideration in determining whether the prosecution has proven the elements of the criminal street gang enhancement. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048; *Ferraez, supra,* at p. 930.) Here, beyond the expert testimony, the record provided "'some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations....'" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) [N.35]

> [N.35] The record also contains support for the notion the homicide benefited the Norteño criminal street gang. The fact there was also evidence the Norteño gang disapproved of "red-on-red" violence, and that Miguel Perez, a gang dropout, nevertheless socialized with a number of individuals with ties to the gang, was something for jurors to assess and does not render the evidence supporting the enhancement insufficient.

The record also contains substantial evidence of the requisite intent, namely, "the specific intent to promote, further, or assist criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 67.) "'[T]he scienter requirement in section 186.22[, subdivision] (b)(1) ... applies to any criminal conduct, without a further requirement that the conduct be "apart from" the criminal conduct underlying the offense of conviction sought to be enhanced.' [Citation.] '[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171.) A specific intent to benefit the gang is not required. (*People v. Leon, supra,* 161 Cal.App.4th at p. 163; *People v. Morales, supra,* 112 Cal.App.4th at p. 1198.)

In the present case, jurors reasonably could have inferred, particularly from the information in the wilas and the gang experts' testimony, that, in fighting with and then shooting Villanueva, defendants had the specific intent to promote, further, or assist criminal conduct by each other as gang members. [N.36] Section 186.22, subdivision (b)(1) "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar, supra,* 51 Cal.4th at p. 68.) Here, there was ample evidence defendants intended to attack Villanueva, assisted each other in bringing about his demise, and were each members of the Norteño criminal street gang. "Accordingly, there was substantial evidence that defendants acted with the specific intent to promote, further, or assist gang members in that criminal conduct." (*Ibid.*; see *Emery v. Clark* (9th Cir. 2011) 643 F.3d 1210, 1216.)

> [N.36] The nature of the evidence in this case distinguishes it from cases such as *People v. Ramon* (2009) 175 Cal.App.4th 843, 846–851; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1195–1199; and *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647–659, disapproved on another

1

2

ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048 and footnote 3.

3

4

5

6

7

We recognize there was evidence from which jurors could have concluded Villanueva was shot by accident or in self-defense, or even intentionally but for reasons that were personal to defendants and unrelated to a gang. This does not mean, however, the gang enhancement was unsupported by substantial evidence. It was up to jurors to determine what evidence to believe. Reversal on the ground of insufficiency of the evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's finding. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Reversal is not warranted here.

8

*Gutierrez*, 2013 WL 4523566, at *34–36.

9

　　　　*b.  Federal Standard*

10

　　　The law on sufficiency of the evidence is clearly established by the United States Supreme

11

Court.  Pursuant to the United States Supreme Court's holding in *Jackson v. Virginia*, 443 U.S.

12

307, the test on habeas review to determine whether a factual finding is fairly supported by the

13

record is as follows:

14

15

[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

16

*Id.*, at 319; *see also* *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of

17

fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to

18

habeas relief.  *Jackson*, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined

19

by state law.  *Id.* at 324, n. 16.

20

　　　If confronted by a record that supports conflicting inferences, a federal habeas court "must

21

presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

22

such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.* at 326.

23

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

24

conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

25

　　　After the enactment of the AEDPA, a federal habeas court must apply the standards of

26

*Jackson* with an additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir.

27

2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

28

correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); *Kuhlmann v. Wilson*,

1  477 U.S. 436, 459 (1986).

2  In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

3  explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

4  makes clear that it is the responsibility of the jury - not the court - to decide what
   conclusions should be drawn from evidence admitted at trial. A reviewing court
5  may set aside the jury's verdict on the ground of insufficient evidence only if no
   rational trier of fact could have agreed with the jury. What is more, a federal court
6  may not overturn a state court decision rejecting a sufficiency of the evidence
   challenge simply because the federal court disagrees with the state court. The
7  federal court instead may do so only if the state court decision was "objectively
   unreasonable."

8
   Because rational people can sometimes disagree, the inevitable consequence of
9  this settled law is that judges will sometimes encounter convictions that they
   believe to be mistaken, but that they must nonetheless uphold.
10

11  Id. at 2.

12  c. Analysis

13  The state court correctly applied the Jackson standard. Therefore, the only question is

14  whether that application was unreasonable. After reviewing the record, the Court cannot

15  conclude that the state court determination was unreasonable.

16  There are two essential elements to the statute: 1) that the defendant committed or

17  attempted to commit the crime for the benefit of, at the direction of, or in association with a

18  criminal street gang; and 2) that the defendant intended to assist, further, or promote criminal

19  conduct by gang members. People v. Gardeley, 14 Cal.4th at 615-16.

20  First, there was ample evidence from which a jury could find that the murder was

21  committed "in association" with the Norteño gang. There was overwhelming evidence that

22  Petitioner and his co-defendant were Norteños. There was also evidence in the wilas written by

23  Petitioner that he and his co-defendant acted against the victim because the victim "promoted

24  himself as a degenerate" and associated with inactive Norteños. (CT 866.) There was evidence

25  that the motivation was to further the interests of the gang. In addition, the murder took place at a

26  gathering of Norteños in full view of the gang. Petitioner relied on the apparatus of the gang to

27  conduct the murder. Based on the foregoing, there was sufficient evidence from which a jury

28  could conclude the murder was done in association with the Norteño gang. According to the gang

71

1   expert, such an act would garner respect and status for Petitioner within the gang, and show

2   others that disrespect to the gang would not be tolerated.

3          Second, there was sufficient evidence from which the jury could find that Petitioner

4   intended to assist and promote criminal conduct by gang members.  In the wila, Petitioner

5   portrayed himself as an active Norteño gang member.  He further explained his actions to the

6   gang leadership as to why he attacked another gang member and why he was justified according

7   to the gang's rules.  The murder took place at a Norteño gathering in full view of the gang, and in

8   association with a fellow gang member.  From the evidence, the jury could infer that Petitioner

9   had the specific intent to promote, further or assist criminal conduct by each other as gang

10  members.

11         Petitioner fails to show that the state court decision was an unreasonable application of the

12  Jackson standard.  The claim should be denied.

13         *8.      Claim Nine – Equal Protection*

14         Petitioner argues that California law imposes a drastically greater punishment upon aiders

15  and abettors of street gang crimes versus those who commit other crimes.  He alleges that this

16  harsher treatment violates his right to equal protection.

17             *a.  State Court Decision*

18         This claim was raised on direct review before the Fifth DCA, which provided the last

19  reasoned decision as follows:

20         No evidence was presented at trial that Saldana shot Villanueva. Nevertheless, his
        sentence was enhanced by a term of 25 years to life in prison pursuant to section
21      12022.53, subdivisions (d) and (e)(1). [N.48] Saldana now contends subdivision
        (e)(1) of section 12022.53 violates his right to equal protection of the laws by
22      treating aiders and abettors of shootings committed for the benefit of a criminal
        street gang differently from aiders and abettors of shootings committed in concert
23      by criminal organizations or groups not defined as street gangs. We reject his
        claim. [N.49]
24

25         [N.48] Section 12022.53 provides, in pertinent part: "(d) Notwithstanding
           any other provision of law, any person who, in the commission of a
26         [specified felony including murder], personally and intentionally
           discharges a firearm and proximately causes ... death, to any person other
27         than an accomplice, shall be punished by an additional and consecutive
           term of imprisonment in the state prison for 25 years to life. [¶] (e)(1) The
28         enhancements provided in this section shall apply to any person who is a
           principal in the commission of an offense if both of the following are pled

1
2

and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision ... (d)."

3
4
5

[N.49] This type of challenge to the constitutionality of a statute may be raised for the first time on appeal. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 200; see also *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722, fn. 2.) Accordingly, we reject the Attorney General's argument the claim was forfeited by Saldana's failure to object in the trial court.

6
7
8
9
10

"The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness. [Citations.] The concept recognizes that persons similarly situated with respect to the legitimate purpose of the law receive like treatment, but it does not, however, require absolute equality. [Citations.] Accordingly, a state may provide for differences as long as the result does not amount to invidious discrimination. [Citations.]" (*People v. Romo* (1975) 14 Cal.3d 189, 196.)

11
12
13
14

"'"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." [Citations.]' [Citation.]" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1427.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

15
16
17
18

In *People v. Gonzales* (2001) 87 Cal.App.4th 1 (Gonzales ), the Court of Appeal rejected an argument that appears to be very close to Saldana's claim. [N.50] The court reasoned: "Unlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct.... [¶] Defendants were not similarly situated with other aiders and abettors, and on that basis, their equal protection claim fails." (Id. at p. 13.)

19
20
21
22
23
24
25
26
27

[N.50] In Gonzales, a fistfight among members of rival gangs resulted in the victim being shot and killed. The three defendants all were tried and convicted of first degree murder committed for the benefit of a criminal street gang, and the sentence of each was enhanced by a term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e). (*Gonzales, supra,* 87 Cal.App.4th at p. 7.) One of the defendants, Steven, challenged imposition of the enhancement. As initially stated by the Court of Appeal, Steven argued the statute violated his right to equal protection "because it treats aiders and abettors of gang crimes differently from other aiders and abettors...." (*Id.* at p. 12.) A short time later, however, the appellate court stated: "Steven argues that an aider and abettor of a gang member is similarly situated to aiders and abettors of firearm users who are not members of a criminal street gang." (*Id.* at p. 13.) We assume the first formulation of Steven's argument is more accurate than the second one, since section 12022.53, subdivision (e) refers to section 186.22, subdivision (b)—the gang enhancement—and section 186.22, subdivision (b) does not require gang membership. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402.)

28

Were we to find no disparate treatment of similarly situated groups, Saldana's

claim would fail under *Gonzales*. Were we to conclude he made the requisite threshold showing, however, a second level of analysis would be required: "'If the law in question impinges on the exercise of a fundamental right, it is subject to strict scrutiny and will be upheld only if it is necessary to further a compelling state interest. All other legislation satisfies the requirements of equal protection if it bears a rational relationship to a legitimate state purpose. [Citation.]'" (*Gonzales, supra*, 87 Cal.App.4th at pp. 12–13.) Saldana asserts strict scrutiny must be applied, because the statute abridges his fundamental liberty interest.

In *People v. Hernandez* (2005) 134 Cal.App.4th 474 (*Hernandez*), the Court of Appeal examined *Gonzales*, then considered and rejected the argument Saldana now makes. "Where as here the question is not whether to deprive Hernandez of his liberty but for how long, we believe rational basis review, not strict scrutiny, is the appropriate test to resolve an equal protection challenge." (*Hernandez, supra*, 134 Cal.App.4th at p. 483.) The court concluded the enhancement provided by section 12022.53, subdivision (e)(1) satisfied the rational basis test: "Clearly the Legislature had a rational basis for imposing a 25–years–to–life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator. As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.' One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder." (*Hernandez, supra*, 134 Cal.App.4th at p. 483, fn. omitted.) [N.51]

> [N.51] "The legislative intent behind section 12022.53 is clear: 'The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime.' [Citation.]" (*People v. Garcia* (2002) 28 Cal.4th 1166, 1172.) Subdivision (e)(1) of the statute "provides a 'clear expression of legislative intent' [citation] to 'severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang. It has done so in recognition of the serious threats posed to the citizens of California by gang members using firearms.' [Citation.]" (*People v. Garcia, supra*, at p. 1172.)

Relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), Saldana argues we should not adopt the rational basis test endorsed by *Hernandez*. We are not persuaded. In *People v. Wilkinson* (2004) 33 Cal.4th 821, 837–838 (*Wilkinson*), the California Supreme Court stated:

> "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals. Nevertheless, *Olivas* properly has not been read so broadly. As the court observed in *People v. Davis* (1979) 92 Cal.App.3d 250: 'It appears ... that the *Olivas* court did not want to increase substantially the degree of judicial supervision of the Legislature's criminal justice policies. Such a highly intrusive judicial reexamination of legislative classifications is not merited by a close reading of *Olivas*. There is language in the *Olivas* opinion that emphasizes

the narrowness of the holding.... This language requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor.' [Citation.] Other courts similarly have concluded that a broad reading of *Olivas*, as advocated by defendant here, would 'intrude [ ] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.' [Citations.]

"We find the rational basis test applicable here. Defendant contends that the statutory scheme regarding battery on a custodial officer violates equal protection principles because it allows the 'lesser' offense of battery without injury to be punished more severely than the 'greater' offense of battery with injury. *A defendant, however, 'does not have a fundamental interest in a specific term of imprisonment* or in the designation a particular crime receives.' [Citations.] Defendant makes no claim that the classification here at issue involves a suspect class, nor does her claim implicate any interest akin to that at issue in Olivas, in which an individual faced a longer period of confinement if treated as a juvenile rather than as an adult. Application of the strict scrutiny standard in this context would be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment." (Italics added.)

Under *Wilkinson*, the rational basis test is applicable to Saldana's claim. Application of this test results in the conclusion section 12022.53, subdivision (e)(1) does not violate equal protection principles.

Gutierrez, 2013 WL 4523566, at *47–50.

### *b.  Federal Standard and Analysis*

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).

Petitioner argues that California's sentencing scheme, which imposes a twenty-five year enhancement pursuant to Cal. Penal Code § 12022.53, must survive strict scrutiny because it deprives him of his liberty, which is a fundamental interest.  Petitioner is incorrect.  He is not being deprived of his liberty, because he has already been convicted.  The provision is a sentencing statute which specifies the length of custody.  Sentencing statutes are subject to the rational basis test.  See, e.g., McQueary v. Blodgett, 924 F.2d 829, 834 (9th Cir. 1991); see also United States v. Richardson, 793 F.3d 612, 633 (6th Cir. 2015) ("no such right to liberty exists for

1    a person who has been justly convicted").  A statutory sentencing scheme that does not

2    disadvantage a suspect class or infringe upon the exercise of a fundamental right, as is the case

3    here, is subject only to rational basis scrutiny.  United States v. Harding, 971 F.2d 410, 412 (9th

4    Cir. 1992).  It can be disturbed only if the petitioner can prove "that there exist no legitimate

5    grounds to support the classification."  Id. at 413.

6         Although Equal Protection does not require that all people be treated identically, it does

7    require that distinctions bear some relevance to the purposes for which they were made.

8    Baxstrom v. Herold, 383 U.S. 107, 111 (1966).  Under the rational basis test, the classification set

9    out in section 12022.53(e)(1) must bear some rational relation to a legitimate government interest

10   or purpose. Schweiker v. Wilson, 450 U.S. 221, 230 (1981).  The burden falls on the party

11   attempting to disprove the existence of a rational relationship between a statutory classification

12   and a government objective.  Harding, 971 F.2d at 413.

13        Here, Petitioner must be able to demonstrate that the relevance of the distinction between

14   aiders and abettors of gang members and aiders and abettors of other crimes is not even

15   debatable.  See United States v. Carolene Products Co., 304 U.S. 144, 154 (1938) (a statutory

16   classification based on a question which is at least debatable is valid).  To do so, he must prove

17   that there exist no legitimate grounds to support the classification.  Minnesota v. Clover Leaf

18   Creamery Co., 449 U.S. 456, 464 (1981).  However, the state court reasonably determined that an

19   aider and abettor of a gang member is not similar to other aiders and abettors.  As has been noted

20   by the California Court of Appeal, "Unlike other aiders and abettors who have encouraged the

21   target offense resulting in a murder, defendants committed their crime with the purpose of

22   promoting and furthering their street gang in its criminal conduct."  People v. Gonzales, 87

23   Cal.App.4th 1, 13 (2001).

24        In addition, California has made it clear that there is a rational basis for the punishment set

25   forth in Cal. Penal Code § 12022.53(d)-(e):

26        In enacting the street gang legislation in 1988 the Legislature found, among other
          things, "in Los Angeles County alone there were 328 gang-related murders in
27        1986, and that gang homicides in 1987 have increased 80 percent over 1986."
          When the Legislature enacted section 12022.53 ten years later and made aiders and
28        abettors of gang crimes involving gun use equally liable with the actual perpetrator

                                             76

1    it did so "in recognition of the serious threats posed to the citizens of California by
     gang members using firearms." As our Supreme Court has stated, the Legislature
2    "is not prohibited by the equal protection clause from striking the evil where it is
     felt the most."
3

4    People v. Hernandez, 134 Cal. App. 4th 474, 482 (2005) (footnotes omitted).

5         Therefore, Petitioner has failed to demonstrate that the state court unreasonably applied

6    Supreme Court precedent when it rejected Petitioner's claim that the twenty-five year

7    enhancement violated his right to equal protection.

8         9.     *Claim Ten – Ineffective Assistance of Appellate Counsel*

9         Petitioner argues that his appellate counsel was ineffective in failing to raise numerous

10   issues on appeal.  This claim was presented in a habeas petition filed in the California Supreme

11   Court, and it was summarily denied.   Since the state court decided the claim on the merits but

12   provided no reasoning for its decision, the court must conduct "an independent review of the

13   record . . . to determine whether the state court [was objectively unreasonable] in its application

14   of controlling federal law."  Delgado, 223 F.3d at 982.

15        a.  *Federal Standard*

16        Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

17   Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

18   counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d

19   1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also

20   Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or

21   constructively denied the assistance of counsel altogether, the Strickland standard does not apply

22   and prejudice is presumed; the implication is that Strickland does apply where counsel is present

23   but ineffective).

24        To prevail, Petitioner must show two things.  First, he must establish that counsel's

25   deficient performance fell below an objective standard of reasonableness under prevailing

26   professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

27   must establish that he suffered prejudice in that there was a reasonable probability that, but for

28   counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable

77

1    probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.

2    The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

3    by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

4         With the passage of the AEDPA, habeas relief may only be granted if the state-court

5    decision unreasonably applied this general Strickland standard for ineffective assistance.

6    Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

7    federal court believes the state court's determination under the Strickland standard "was incorrect

8    but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

9    Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

10   is "doubly deferential" because it requires that it be shown not only that the state court

11   determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

12   Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

13   state court has even more latitude to reasonably determine that a defendant has not satisfied that

14   standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

15   application was unreasonable requires considering the rule's specificity.  The more general the

16   rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

17        In challenges to the effective assistance of appellate counsel, the same standards apply as

18   with the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285

19   (2000); Smith v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court

20   indicated that an appellate attorney filing a merits brief need not and should not raise every non-

21   frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in

22   order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement

23   that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627

24   F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

25              *b.  Ineffective Assistance of Trial Counsel Claims*

26        Petitioner first alleges that defense counsel rendered ineffective assistance by failing to

27   raise any issue in the area of ineffective assistance of trial counsel.

28        Respondent correctly argues that Petitioner fails to demonstrate that appellate counsel's

78

1   decision was unreasonable.  In California, issues of ineffective assistance of counsel are

2   preferably brought on habeas review in order to enable trial counsel the opportunity to explain the

3   reasons for his or her conduct.  People v. Mendoza Tello, 15 Cal.4th 264, 266-67.  On habeas too,

4   California courts are able "to determine the actual, as opposed to hypothesized, reasons for

5   counsel's acts or omissions."  People v. Pope, 23 Cal.3d 412, 426 n.17 (1979).

6   *c.  Additional Prosecutorial Misconduct Claims*

7        Petitioner also faults appellate counsel for failing to raise claims of prosecutorial

8   misconduct and the admission of gang evidence.  Petitioner claims counsel failed to raise

9   "numerous assignments of error like the plethora of unrelated gang evidence that was before the

10  jury."  Pet. at 34.  He fails to identify which evidence he is challenging, and in fact, appellate

11  counsel did raise several claims concerning the admission of certain gang evidence.  Appellate

12  counsel is under no duty to raise every conceivable claim.

13       Likewise, Petitioner claims appellate counsel failed to raise prosecutorial misconduct

14  concerning statements he made on cross-examination that Petitioner was a serial car thief and that

15  gang members ran a witness out of state.  However, appellate counsel did raise a claim of

16  prosecutorial misconduct concerning his statements in closing argument.  As to the question of

17  Petitioner being a serial car thief, no objection was made at trial.  Therefore, the issue would have

18  been weak on appeal.  Counsel was not unreasonable for foregoing this issue in favor of the

19  stronger issue of alleged misconduct.  As to the statement of "running a victim out of state," the

20  appellate claim was meritless because defense counsel successfully objected, moved to strike and

21  requested the court admonish the jury.  He received the relief he requested at trial.

22       Accordingly, Petitioner fails to show that the state court unreasonably rejected his claims

23  of ineffective assistance of appellate counsel.

24  *10.    Claim Eleven – Ineffective Assistance of Trial Counsel*

25       Petitioner claims he was denied the effective assistance of trial counsel for fifteen

26  different acts and omissions.  This claim was also raised and summarily rejected in a habeas

27  petition to the California Supreme Court.  The same standards set forth in Claim Ten above

28  concerning the assistance of counsel apply here.

### a. Failure to Call Witnesses

Petitioner first alleges that defense counsel failed to call Tazminder Dillion, Darnell Lambert, Thomas Gonzales, Suave Bernal, and Moses Martinez as witnesses.  He says he notified counsel of these potential witnesses but states counsel failed to contact them.

Petitioner speculates that the witnesses would have testified that the victim was actually the aggressor, that the victim led Gutierrez to the backyard and not the other way around, that Gutierrez acted in self-defense when the victim pulled a gun from his waistband, and that Petitioner had no involvement.

As correctly stated by Respondent, Petitioner fails to present sufficient facts or evidentiary support to rebut the presumption that counsel rendered effective assistance.  Petitioner's argument as to what these additional witnesses would have testified, without more, is pure conjecture.  In order to carry his burden, Petitioner "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  Petitioner has failed to do so.  Moreover, counsel's reasons not to call these witnesses are completely unknown.  It is unknown whether counsel attempted to contact them, what the results were, and what counsel thought about them.  Without any supporting evidence, Petitioner's allegation is pure speculation.

### b. Stipulation to Gang Membership

Petitioner faults counsel for failing to offer to stipulate to Petitioner being a Norteño despite Petitioner's wishes to do so.  Petitioner claims this would have precluded the prosecution from allowing the gang expert to testify to Petitioner's prior bad acts in order to give his opinion that Petitioner was a gang member.

Petitioner's claim is without merit.  Counsel's reasons for declining to stipulate are unknown.  That being the case, the Court must consider all arguments and theories that may have supported the state court decision.  Harrington, 562 U.S. at 102.  Here, the gang expert's testimony was offered to prove not just that Petitioner was a Norteño, but that the Norteño gang was a criminal street gang within the meaning of Cal. Penal Code § 186.22(f).  The testimony was

80

1   used to prove that Petitioner, Gutierrez, and the Norteño gang were involved in a "pattern of

2   criminal activity" pursuant to Cal. Penal Code § 186.22(f).  Therefore, those prior bad acts would

3   still have been admitted regardless of a stipulation.  Therefore, Petitioner fails to demonstrate any

4   prejudice resulting from counsel's failure to stipulate.

5               *c.   Bifurcation*

6       Petitioner argues counsel was ineffective in failing to request a bifurcated trial on the gang

7   enhancement.  He claims bifurcation was warranted because the gang evidence was highly

8   prejudicial.

9       Counsel's reasons are not in the record. Therefore, the Court must consider all possible

10  arguments or theories that may have supported the state court decision.  Here, it is likely counsel

11  did not make such a motion because it would surely have been denied.  Under California law, the

12  criminal street gang enhancement is attached to the underlying offense and is therefore

13  "inextricably intertwined with that offense." People v. Hernandez, 33 Cal. 4th 1040, 1048

14  (2004).  Counsel cannot be faulted for failing to bring a meritless motion.

15              *d.   Recusal of Prosecutor*

16      Petitioner claims counsel failed to request that the prosecutor be recused because the

17  prosecutor had a personal vendetta against him.  Petitioner claims he had dealings with the

18  prosecutor in the past, and the prosecutor had vowed to bury him one day.  Petitioner points to his

19  cross-examination wherein the prosecutor revealed his vendetta.  The record shows the cross-

20  examination began as follows:

21          Q. [by the prosecutor] Mr. Saldana, regarding your carjacking conviction; you
            remember me; right?
22
            A. [by Petitioner] Yes.
23
            Q. You and I go way back?
24
            A. Yes.
25
            Q. Before the carjacking conviction, you were - - would you consider yourself a
26          serial car thief?

27          A. No, I wouldn't consider myself a serial car thief.

28          Q. How many open auto theft cases did you have at one point?

[Defense objection sustained.]

Q. Regarding the carjacking conviction, you say you got three years in prison?

A. Yes.

Q. Tell the jury why you got a mitigated sentence.

. . .

A.  I don't know.

Q. Because the Norteños chased the victim out of state?

[Counsel's objections were sustained, and counsel's motion to strike and admonish the jury were granted.]

(RT 1844-45.)

Nowhere in the cross-examination does the prosecutor state he is going to "bury" the petitioner.  Rather, the colloquy shows only that the prosecutor was aware of Petitioner's criminal history and had prosecuted him before.  Petitioner's criminal history was revealed at trial as was his prior carjacking offense.  There were no grounds for recusal.  At most, defense counsel could have objected, moved to strike, and request an admonishment to the jury, which is precisely what occurred.  A motion for recusal would surely have been denied.  Counsel is not ineffective in failing to bring a meritless motion.

   e.  *Objections to Prosecutor and Seeking a Mistrial*

In a related claim, Petitioner argues that defense counsel failed to request a mistrial after "extreme prejudicial misconduct."  (Pet. at 38.)  Petitioner points to instances in the prosecutor's cross-examination of Petitioner where the prosecutor asked allegedly inappropriate questions.  Petitioner complains that the prosecutor made remarks about his criminal past, such as his remark that the two "go way back," that Petitioner may be a "serial car thief," that Petitioner received a mitigated sentence on his prior conviction, that "the Norteños chased the victim out of state," that the jury should "send a message to the gang," that Petitioner and his co-defendant were a "two man hit squad," and that Norteños are "not allowed to watch religious channels."  (Pet. at 38-40.)  He further complains that the prosecutor "reinstruct[ed] the jury" during closing arguments by rephrasing the jury instructions.  (Pet. at 40.)

1    Defense counsel's decision to object is a matter of trial tactics and strategy over which

2    counsel has a large degree of discretion, and "a court must indulge a strong presumption that

3    counsel's conduct falls within the wide range of reasonable professional assistance...." Strickland,

4    466 U.S. at 689.  In addition, "absent egregious misstatements, the failure to object during the

5    closing argument and opening statement is within the 'wide range' of permissible professional

6    legal conduct." United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir.1993).

7    Upon review of the challenged statements, the Court cannot find the state court rejection

8    of the claim to be unreasonable.  In several of the instances pointed to, such as the prosecutor's

9    comments on the mitigated sentence, whether the gang chased the victim out of state, and sending

10   a message to the gang, defense counsel did object, did move to strike, and did request an

11   admonishment.  In other instances, such as comments on Petitioner's criminal past, counsel did

12   object, and it was at least debatable whether the comments were fairly based on the evidence.  In

13   those instances where counsel did not object, such as when the prosecutor characterized Petitioner

14   and his co-defendant as a "two man hit squad," it is at least debatable whether the comment was

15   fairly based on events in evidence.  With respect to the gang expert's testimony that Norteños do

16   not allow gang members to watch religious channels in prison, there is no evidence the statement

17   was false, and in any case, it was a minor comment within the entirety of the gang expert's

18   testimony concerning the manner in which Norteños enforce their rules in prison.  (RT 1053-56.)

19   Finally, Petitioner complains that the prosecutor rephrased the jury instructions during closing,

20   but attorneys are free to discuss the jury instructions during closing and argue how the evidence

21   relates to them.  Thus, Petitioner fails to demonstrate that the state court rejection of this

22   ineffective assistance claim was an unreasonable application of Strickland.

23                      *f.  Motion to Sever*

24   Petitioner claims counsel was ineffective in failing to move to sever trials when it was

25   learned that extra security measures would be in place due to the discovery of a potential weapon

26   in Gutierrez's cell.  This argument is without merit.  There is no evidence that the extra security

27   measures could have had any prejudicial effect on the outcome of the case.  Petitioner was not

28   restrained in any visible way, and the presence of a third security person in the courtroom was

1    inconsequential.  There is no indication that the jury could even have been aware of the extra

2    security measures.  A motion to sever on this basis would surely have been denied.

3                    *g.  Motion for New Trial*

4        Petitioner claims counsel was ineffective in failing to move for a new trial.  Petitioner

5    states he requested that counsel file one, but counsel told him he would be moving out of the

6    country and did not have the time to file one.  Counsel further advised him that a new trial motion

7    was a waste of time because the issues would be dealt with on appeal.

8        Respondent is correct that the claim is vague and unsupported by any evidence apart from

9    Petitioner's self-serving statement.  Moreover, Petitioner states he had "excellent reasons for a

10   new trial motion" but he fails to state what those reasons were and how they could have been

11   successful.

12                   *h.  Verdicts on Degree of Murder*

13       Petitioner argues that the jury failed to determine the degree of murder in its verdict;

14   therefore, counsel should have argued that Petitioner be sentenced to the lowest degree.  The

15   record is clear, however, that the jury found Petitioner guilty of first degree murder.  The verdict

16   form reflects the jury's findings that Petitioner was guilty of murder and that "the defendant did

17   act intentionally, deliberately, and with premeditation."  (RT 2118; CT 1052.)

18                   *i.  Victim Impact Statements*

19       Petitioner claims defense counsel allowed the prosecution to read victim impact

20   statements in violation of Cal. Penal Code § 1204.  Two statements were read, written by the

21   victim's ex-fiancée and the victim's mother.  (RT 2135-39.)

22       Petitioner's argument is not well-taken, because the reading of victim impact statements is

23   specifically authorized under California law.  "The language of [California Penal Code] section

24   1204 applies only to evidence of mitigating and aggravating factors, not generic victim

25   statements."  People v. Mockel, 226 Cal.App.3d 581, 588 (1990).  Cal. Penal Code §§ 1170,

26   1191.1, and 1191.15 specifically provide and allow for the use of written victim impact

27   statements.  Therefore, there were no grounds for defense counsel to object.

28   ///

84

*j.   Waiver of Right to Jury Trial on Prior Conviction*

Petitioner alleges counsel was ineffective in advising him to waive his right to a jury trial on his prior conviction.  He claims counsel then failed to object to the procedure by which the prosecutor amended the information to reflect Petitioner's prior conviction was for the lesser offense of carjacking rather than kidnapping during a carjacking.

Petitioner's claim is without merit.  He does not state what different procedure defense counsel should have insisted on, and it is clear from the documentary evidence that Petitioner had a prior conviction for carjacking.  Whatever procedure defense counsel would have chosen, the result would have been the same.

Petitioner also claims his waiver of a jury trial on his prior was unknowing.  This claim is belied by the record.  Petitioner specifically stated he understood his right to jury trial on his prior.  (RT 2122.)  Regardless, Petitioner does not show how he would have defended against the allegation in a jury trial any different from the court trial.

*k.   Restitution Fine*

Petitioner next claims he asked counsel to request a hearing on his ability to pay the $17,000 restitution fine, but counsel declined, stating he did not have time for frivolous matters.  (Pet. at 42.)

During sentencing, the court stated, "Before I get there, do either defense counsel have any comments about the restitution request?"  (RT 2144.)  Petitioner's counsel responded, "My client is not prepared to agree with that, Your Honor." (RT 2144.)  Gutierrez's counsel then stated, "Nor is mine.  And my client has no ability to pay." (RT 2144.)  The court then ordered restitution for the victim's mother in the amount of $7,500, and a restitution fine in the amount of $10,000.  (RT 2144-45.)

Respondent correctly points out that Petitioner fails to demonstrate any prejudice resulting from counsel's failure to request a hearing.  Petitioner does not point to any evidence that would have demonstrated an inability to pay, such that the outcome would have been different.  Petitioner was sentenced to a lengthy term and he would be able to work in prison, which would provide opportunity to pay the fines.  Therefore, the claim should be rejected.

1

*l.   Discipline by the Gang*

2       Petitioner argues that defense counsel did not allow him to present evidence that he and

3   his co-defendant were not cleared by the Norteño gang for the shooting of the victim, contrary to

4   what the gang expert testified.  Petitioner states he asked defense counsel to call a fellow gang

5   member as a witness who would testify that Petitioner and his co-defendant were disciplined by

6   the gang for the shooting.  Petitioner states defense counsel refused, stating he did not want more

7   gang evidence introduced because this would only inflame the jury.

8       As previously stated, in order to carry his burden, Petitioner "must name the witness,

9   demonstrate that the witness was available to testify and would have done so, set out the content

10  of the witness's proposed testimony, and show that the testimony would have been favorable to a

11  particular defense." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  Here, it is unknown if

12  counsel spoke to the witness, what the witness stated, whether the witness would have

13  cooperated, whether he would have testified, and whether he would have testified favorably.

14  Without any supporting evidence, Petitioner's allegation is speculation.

15

*m.   Motion to Strike or Suppress Pathologist's Testimony*

16      The pathologist testified that the victim was shot in the head at close range.  Petitioner

17  states there was no indication of this close range shot in the pathologist's report.  Petitioner claims

18  counsel should have moved to strike or suppress this statement.

19      However, counsel did in fact cross-examine the pathologist concerning the report to the

20  effect that "[n]one of the gunshot wounds show evidence of close-range firing on the skin around

21  the entrance of the bullet holes." (RT 989-90.)  The pathologist responded that he did not find

22  evidence of gun powder on the skin indicating a close range shot, but he did find abrasions that

23  did indicate close range.  (RT 990-91.)  Given this testimony, Petitioner fails to show that a

24  motion to suppress or strike would have been successful, and ultimately fails to demonstrate that

25  the state court rejection of his claim was unreasonable.

26

*n.   Evidence of Shoebox*

27      Petitioner argues that counsel was ineffective in failing to object or move to exclude

28  evidence of a shoebox in Tapia's bedroom after it was discovered that the shoebox had been lost.

He alleges that defense counsel sought the shoebox in order to perform testing on it to find traces of marijuana, which would have been consistent with the defense theory that the shoebox was used to transport marijuana rather than a gun.

There is no indication that the shoebox was kept from the defense by the prosecution.  The record shows that the shoebox was discussed during trial, and neither defense counsel objected that they had never heard of the shoebox.  They did not bring to the trial court's attention any grievance that they had desired to test the shoebox but were prevented from doing so by the prosecution.

In addition, there is nothing to show that the shoebox would have provided any material evidence for the defense.  Even if marijuana residue had been detected, this would not eliminate the possibility that Tapia had used it also to transport the gun as he had stated.  Thus, Petitioner fails to demonstrate any prejudice resulting from counsel's omission.

### o.   Jury Admonishments

Last, Petitioner alleges defense counsel was ineffective in failing to object to the trial court's admonishment to the jury prior to recess.  Rather than reminding the jury not to converse amongst themselves or anyone else, the trial court merely stated "recall the admonishments" prior to excusing the jury. (RT 147.)

Cal. Penal Code § 1122 provides:

(a) After the jury has been sworn and before the people's opening address, the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, all of the following admonitions:

(1) That the jurors shall not converse among themselves, or with anyone else, conduct research, or disseminate information on any subject connected with the trial. The court shall clearly explain, as part of the admonishment, that the prohibition on conversation, research, and dissemination of information applies to all forms of electronic and wireless communication.

(2) That they shall not read or listen to any accounts or discussions of the case reported by newspapers or other news media.

(3) That they shall not visit or view the premises or place where the offense or offenses charged were allegedly committed or any other premises or place involved in the case.

(4) That prior to, and within 90 days of, discharge, they shall not request, accept,

agree to accept, or discuss with any person receiving or accepting, any payment or benefit in consideration for supplying any information concerning the trial.

(5) That they shall promptly report to the court any incident within their knowledge involving an attempt by any person to improperly influence any member of the jury.

(b) The jury shall also, at each adjournment of the court before the submission of the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to conduct research, disseminate information, or converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them. The court shall clearly explain, as part of the admonishment, that the prohibition on research, dissemination of information, and conversation applies to all forms of electronic and wireless communication.

Cal. Penal Code § 1122.

As pointed out by Respondent, in a lengthy trial, it becomes tedious and unwieldy to repeat these admonitions every time the jury is recessed.  Therefore, it is commonplace to stipulate that the admonishments not be repeated in full.  The attorneys did so in this case.  (RT 147.)  The trial court then advised the jury:

Ladies and gentlemen, each break and every afternoon when you leave, I'll say something to the effect, "recall the admonition."  All I'm doing is telling you in shorthand to recall what I just read to you about the separate admonition, not to talk about the case, not to make up your mind, et cetera, et cetera. Okay?

(RT 147, 226.)

There is no question that counsel's stipulation was within the wide range of competent assistance.  In addition, Petitioner cannot demonstrate prejudice.  There is no indication in the record that the jury forgot the instruction, or that the jurors did not abide by the instruction.

p.  Conclusion

In sum, Petitioner fails to show that counsel's performance was deficient or that he suffered prejudice as a result.  He has not shown that the state court rejection of this claim was contrary to or an unreasonable application of Supreme Court authority.  The claim should be rejected in its entirety.

11.   Claim Twelve – Co-Defendant's Counsel

In his last claim for relief, Petitioner contends that his co-defendant's trial counsel was a person of interest named in a murder investigation at the same time he was representing

88

1    Petitioner's co-defendant.

2         It is unclear how Petitioner believes this affected his constitutional rights.  Regardless, a

3    defendant has no standing to present a claim based on a co-defendant's Sixth Amendment right to

4    counsel.  United States v. Jones, 44 F.3d 860, 873 (10th Cir. 1995).

5    **IV.    RECOMMENDATION**

6         Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus

7    (Doc. 1) be DENIED with prejudice.

8         This Findings and Recommendation is submitted to the United States District Court Judge

9    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

10   Local Rules of Practice for the United States District Court, Eastern District of California.  Within

11   twenty-one days after being served with a copy of this Findings and Recommendation, any party

12   may file written objections with the Court and serve a copy on all parties.  Such a document

13   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

14   to the Objections shall be served and filed within ten court days (plus three days if served by

15   mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

16   pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections

17   within the specified time may waive the right to appeal the Order of the District Court.  Martinez

18   v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19

20   IT IS SO ORDERED.

21       Dated:   **February 15, 2017**            **/s/ Jennifer L. Thurston**
                                               UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28